BOTELER AND BELT, *vs.* JOHN BROOKES.—*December* 1835

A trustee to sell mortgaged property under a decree, *is* an officer of the court of Chancery; and as such, bound to obey its mandates in his fiduciary relations. His obligations are doubly secured—*first*, by the coercive authority of the court, and *second*, by his legal obligations, growing out of the security furnished by his bond.

The sureties of such a trustee have no official duties to perform; assume no responsibility to the court; but in general enter into a merely pure legal contract of suretyship, incapable of coercion, except through the medium of the appropriate forum for the enforcement of such contracts—a legal tribunal.

By the act of 1785, ch. 72, sec. 3, the Legislature had a two-fold object in view in authorizing a sale of mortgaged premises. It was calculated to save a portion of the mortgaged estate from passing to the mortgagee, beyond the

power of redemption, and to secure to the mortgagee by a sale, a speedy, and expeditious payment of the money loaned by him. It contemplated that no more of the mortgaged premises should be sold, than was practically unavoidable, and necessary to pay the debt and expenses, and therefore did not look to the interest of the mortgagor, or his assignee, in a possible surplus fund.

That section of the act, after directing the trustee appointed to sell, to give bond for the faithful execution of his trust, declares, that upon a failure to execute such trust, the *party grieved,* shall have a right to bring suit on such bond against principal and securities, and shall recover the money for which the mortgaged premises sold. By the terms *party grieved,* are necessarily meant the mortgagee.

Other sections of the act of 1785, give the mortgagor a remedy on the trustees bond against the principal and his sureties, if the trustee be faithless to his trust, just as all other persons.

A mortgagor in equity has the same redress against the person of a trustee of that court, who retains a surplus arising from sales of the mortgaged premises in his hands, and by the inherent power of the court, as a defendant in a court of common law has against a sheriff, who had levied more money than would satisfy the plaintiff's debt, and refused to pay it over. But in neither court, is there a summary remedy against the sureties of either officer, without positive enactment.

The court of Chancery has no power to issue an attachment against the sureties of a trustee of that court, for the sale of mortgaged premises, upon the petition of the mortgagor, demanding payment of a surplus of the proceeds after discharge of the mortgage debt.

All steps of the court, preparatory to such a procedure, where they assume the character of decretal orders, must be the subject of revision by this court, and are equally invalid as would be the process affecting the liberty of the sureties.

Where a cause in equity had proceeded to a decree for the sale of mortgaged premises, and the trustee appointed having made the sale was dead, and his bond lost, creditors, entitled to share in the surplus, cannot by petition filed in the cause, make the sureties of the trustee parties, for the purpose of establishing the bond of the trustee, as a lost bond. The fund not being in court, and having no means by the death of the trustee, of operating by the power of the court upon the fund, the creditors are strangers to the cause, and the sureties of the trustee are also strangers to it.

The act of 1832, ch. 307, is not a general prohibition as to the raising of points in the appellate court, which were not made below. It extends only to the three following cases. 1st. The competency of witnesses. 2nd. The admissibility of evidence. 3d. The sufficiency of the averments in the bill or petition.

To a petition filed in a cause in equity, which the petitioner had no right to prosecute at all, no exception is necessary under the act of 1832, ch. 307, to enable the appellate court to review the cause upon appeal.

APPEAL from CHANCERY.

The appellee, together with one *Philemon Chew*, for himself, and on behalf of the creditors of *Henry M. Chew, and Company*, filed their petition on the equity side of *Prince George's* County court, on the 4th of July 1834, against the appellants, as the sureties of one *Dorsey*, who had been appointed by a decree of that court, a trustee for the sale of certain premises, mortgaged by a certain *Walter B. Brooke* to *Lucy S. Brooke*.

The petition alleged, that upon a bill filed by the mortgagee on the equity side of the County court, a decree passed for the sale of the mortgaged premises in July 1830. That *Dorsey* was appointed trustee for that purpose, and that the appellants became bound with him, in a bond as his sureties, for the faithful performance of the trust; which bond has since been withdrawn, lost, or destroyed. That *Dorsey* subsequently sold the property, and received large sums on account thereof; and that, after the ratification of the sale, a portion of the proceeds was awarded, by order of the court, to the satisfaction of a judgment rendered against the mortgagor *Brooke*, at the suit of the petitioner *Chew*, for the use of the creditors of himself, and *Henry M. Chew*, trading under the style, and firm of *Henry M. Chew, & Co.* That the order of the court directing the payment of this money, was shown the trustee, who was requested, but refused to pay the same. That the judgment which had been so as aforesaid rendered against the mortgagor *Walter B. Brooke*, was superseded by the appellee, and one *William H. Hall*, and that the money due thereon, was afterwards, by reason thereof, paid by the appellee, who thereupon obtained an order from the proper authority, and had entered for his use the aforesaid original judgment against the mortgagor; which he alleges, entitles him to the benefit of the order on the trustee before mentioned, and to all the other remedies, legal and equitable, to which the original judgment creditor was entitled. That the trustee *Dorsey*, has since died insolvent, and that no administration has been had on his estate. That the appellee after

wards gave the appellants notice of his claim resulting from these proceedings, and demanded of them the money which they have refused to pay; and he therefore *prayed*, that they might be compelled by order of the court to pay him, or to bring the money into court for that purpose.

The proceedings having been transmitted to the high court of Chancery, *Bland* Chancellor, on the 10th of July 1834, ordered that the appellants bring the money with interest thereon into court, or shew cause to the contrary on the 15th of August then ensuing.

In shewing cause, the appellants stated various grounds of defence, among others, that the appellee had sued them at law on an office copy of the trustees bond, which had resulted in a judgment in their favor, and that a new trial of the cause, having been ordered by the court, the same was still depending; and that the appellee, having thus elected his remedy, if it was competent for him to proceed, either at law, or in equity, should not be permitted to vex them with a double proceeding. That the appellees in any view of the case, were not amenable to the summary process of the court, their contract being a legal one, and to be enforced only in a court of law, where the benefit of a jury trial would be afforded them. They also denied, that the trustee had received any money applicable to the payment of the claim asserted by the appellee; and exhibited with their answer, the copy of a petition which they had filed, for leave to review the order of the court, directing the trustee to pay said claim.

Afterwards, on the 20th of August 1834, his Honor *Bland* Chancellor, ordered the appellants forthwith to pay the money, or bring the same into court to be paid to the appellee, together with his costs; upon the ground, that the appellants were responsible therefor, and that the mode of proceeding adopted by the appellee to enforce the responsibility, was the proper one.

From this order, the appellants appealed to the Court of Appeals.

The cause was argued before BUCHANAN, Ch. J. and
STEPHEN, ARCHER, DORSEY, and CHAMBERS, Judges.

MAGRUDER, T. F. BOWIE, and JOHNSON for the appellants,
contended,

1. That there is *nothing in the record to* show, that they
are responsible in any form, or in any court to the petitioners,
or either of them. The answer, so far as it is responsive to
the petition is to be taken as true, there being no counter-
vailing proof, which principle of itself must be fatal to the
application, even if it were not obnoxious to objections of
form, as the whole of the equity is sworn away. In fact,
upon a petition like the present, the entire answer is to be
credited, whether responsive to the allegations of the petition
or not. *Frazer et al, vs. Palmer,* 2 *Harr. and Gill* 469.
*Anderson vs. Foulke, Ib.* 346. *Maccubbin et al, vs. Cromwell,*
*Ib.* 443.

2. The act of 1785, ch. 72, does not embrace a case like
the present, by its terms, and the provision relied upon in
justification of the course adopted, being in derogation of
common law rights, and at variance with the usual course of
courts of Equity, is to be construed strictly.

In the several sections of the act of 1785, by which trus-
tees are authorized to be appointed, and required to give
bond, there is no authority for the proceeding adopted here,
except in the single case of a mortgagee. He and he alone
is authorized to ask for an attachment, which would follow as
a matter of course, upon the neglect or refusal of the party to
comply with the order passed in this case. And in the case
of property sold to pay a mortgage debt, if the trustee pays
the mortgagee, his liability to attachment is at an end, though
a surplus may remain in his hands. His authority under the
act, is to sell, to pay the mortgage debt, and the court can
only proceed against him in the manner pointed out by the
act, in reference to that debt. The right of the general cred-
itors to the surplus, is not founded upon the provisions of the
law of 1785, but upon the inherent powers of the court, and

principles of general equity. It is only in the case of the mortgagee, that the court can, in a summary way, order the money to be brought in. He is, " the party grieved," intended by the 3d section. The 8th section, which authorizes others than the mortgagee to sue the bond, provides for the recovery of damages.

3 Chancery has no jurisdiction in the present case at all, either by petition, or original bill. It is true, Chancery may relieve in the case of a lost bond, and the reason is, that being lost, profert cannot be made, in an action at law. But upon a bond like this, profert of the original need not be made, and it no where appears, that an office copy could not have been had. *Butler and Belt vs. The State, use of Contee and Bowie,* 5 *Gill and Johns.* 520. *Coop.* 28.

The case therefore stands as if the bond had not been lost. The court then is entirely without jurisdiction, in any form, and this appearing upon the face of the petition, is fatal to a recovery. *Mitf.* 155.

4. But conceding the jurisdiction of the court, and the right to proceed in this summary way, the pendency of the action at law upon the same bond, is of itself a valid objection to the order of the Chancellor. This defence is presented by the answer, and the petitioner required to elect with sufficient distinctness. 3 *Mad.* 358. *Anderson vs. Foulke,* 2 *H. and G.* 373. *Beames orders* 11. *Browne vs. Poyntz,* 3 *Mad. Rep.* 20. *Fisher vs. Mee,* 3 *Merrivale* 45.

5. These objections are open to the appellants, notwithstanding the act of 1832, ch. 307. That act only requires exceptions, in case of objections to the competency of witnesses, the admissibility of evidence, and to the averments of the bill. But here the objection is to the liability of these parties at all, in this, or any other form of proceedings.

PRATT and ALEXANDER for the appellee, insisted,

1. That the appellants are liable in this form of proceeding under the act of 1785, ch. 72, sec. 3. The order upon *Dorsey* the trustee to pay the money is conclusive, upon both

him and his sureties. *Contee and Bowie vs. State, use Boteler and Belt,* 5 *Gill and Johns.* 511, 520. And being so conclusive, many of the defences set up in the answer, are out of the case. The words " party grieved," cannot be confined to the mortgagee, or else the trustee would in no case be allowed to sell property beyond the mortgage debt, which is constantly done, and indeed, would be extremely difficult to avoid.

If more is sold, then other parties than the mortgagee become interested, and of course may be " grieved" by the misconduct of the trustee. *Brown and Brown vs. Wallace and Mitchell,* 4 *Gill and Johns.* 479. Whether the contract is a legal one or not, is not the question. The enquiry is, have the Legislature authorized the proceeding—if they have, their power to do so, will not be questioned. It does not necessarily follow, that the process of attachment must be resorted to, to enforce the order. A *fi. fa.* or *ca. sa.* might issue upon it.

2. Independently of the act of 1785, the loss of the original bond constituted a sufficient ground for a proceeding in equity. It is true, a suit at law might have been brought on an office copy, but that would not have availed the plaintiff against the plea of *non est factum.* He was therefore entitled to go into equity at once. If it be objected, that a bill should have been filed, we reply, the objection if good, should have been taken by demurrer. But a petition, which gave the defendants the advantage of every defence, was an equally appropriate remedy. *Anderson vs. Foulke,* 2 *Harr. and Gill* 373, *Ib.* 346.

3. If, however, the proceeding resorted to, was irregular, and not warranted by the act of 1785, the appellants, are precluded from raising the objections by the act of 1832, ch. 302. That law makes exceptions indispensable in all such cases, not only to remove the objections pointed out, if they are curable, but to save the parties the expense of prosecuting a suit, which must end in disappointment.

ARCHER, Judge delivered the opinion of the court.

This is an application, by petition, to the Chancellor, to compel the sureties of a trustee, to bring into court, the proceeds of a sale of mortgaged premises, sold in pursuance of a decree of a court of Equity.

The ordinary power of a court of Chancery, to coerce obedience to its orders, at the hands of its trustee, and officer, is not the subject presented for consideration. But the question is, whether in the case before the court, it possesses any power to order the sureties of a trustee to bring into court, the monies received by their principal in the due execution of his trust.

This question, in ordinary cases, may be determined, by discovering the foundation of the authority of the court over the trustee. The trustee is an officer of the court, and as such, bound to obey its mandates, in all his fiduciary relations. His obligations are doubly secured—first, by the coercive authority of the court, and secondly, by his legal obligations, growing out of the security furnished by his bond.

But the sureties in his bond, maintain no similar relation to the court. They have no official duties to perform ; assume no responsibility to the court, but in general, enter into a merely pure legal contract of suretyship, incapable of coercion, except through the medium of the appropriate forum, for the enforcement of such contracts—a legal tribunal. Their engagement bears no affinity to a recognizance in the common law courts, which is accompanied with the solemnities and partial consequences of a judgment, and differs in nothing from the ordinary contract between man and man, in the usual transactions of society; and must, unless our statutes differently order, be enforced by the same forms, and in the same tribunals.

Such must, undoubtedly, be the results in the ordinary cases of trusteeship, created by the Chancery court, and such the differences existing between the power of enforcing the fulfilment of obligations, in the case of trustees, and their sureties.

It need scarcely be remarked that it is within the compe-

tency of the Legislative power, to prescribe at all times, such changes in the mode of enforcing these respective obligations, as it may in its wisdom prescribe.

It, therefore, remains for us to enquire, in what manner, and to what extent, alterations have been effected in the mode of enforcing these obligations. In examining this subject, we shall confine ourselves, as the case limits us, to such alterations as may have been produced by the third section of the act of 1785, ch. 72.

The Legislature had, no doubt, a twofold object in view, in authorizing a sale of mortgaged premises. As regarded the mortgagor himself, it was a remedy in many cases beneficial to him, as it was calculated to save a portion of his estate from passing to the mortgagee, beyond the power of redemption, while at the same time, full justice was done to the mortgagee; who obtained by a sale the amount loaned, and thus effectually reaped the fruits of his security in the most speedy and expeditious manner. The remedy by foreclosure alone, from its tedious character, was calculated to abridge very much this form of security; and with the view of avoiding difficulties sometimes growing out of foreclosures, the parties themselves had introduced, in many cases, the practice of inserting trusts for sale in mortgages. By simplifying remedies, by furnishing speedy redress, and by rendering these securities available according to the design of the parties, in entering into them, in the shortest time practicable, the Legislature, therefore no doubt designed, to encourage this kind of contract and security. While the law held out to capitalists the greatest possible facilities, to the obtension of full indemnity, through the medium of the courts, it at the same time, gave to those who might desire to take up money on such securities, much more ample means of accomplishing their object. These too, were designs well deserving the attention of the Legislative body, presiding as it does, over the interests of a commercial community, where every effort to bring into captivity unemployed capital, is necessarily calculated to advance the interests of the State.

Such objects are clearly designed by the act of 1784, which appears to be the first law authorizing the sale of mortgaged premises, and which furnished encouragement to foreigners to lend their capital to citizens of the State; and the act of 1785, ch. 72, was but the carrying out of the same great objects among our own citizens, by extending the authority to sell, in all cases of mortgages, where a default had occurred in the payment of the money secured to be paid.

Providing thus the means by a sale, and summary process, for the extinguishment of the mortgaged debt, it was evidently that, which was solely looked to, and not the interest of the mortgagor, or any person who might, as his assignee, be incidentally interested in any possible surplus; for as has been very justly observed, it was not contemplated, that more should be sold than was necessary to extinguish the debt due on the mortgage. And when the remedies by the *third* section are provided, they look only to such sum as would accomplish that object. If indeed the law could have a practical operation, by limiting the sales in all cases, to the exact amount of the mortgage debt, such a proceeding would reach with precision the object of the Legislature. But it is impossible in anticipation to know, that a given number of acres will produce a specific sum of money, and as a sum of money equivalent to the mortgage debt has to be raised, the trustee to carry the act into effect at all, even where the decree limits him to the sale of only so much, as may be necessary to satisfy the debt, must necessarily often have a surplus in hand, which must belong to the mortgagor or those, who, in the eye of a court of Equity may represent him.

But the Legislature, looking alone to the satisfaction of the mortgage debt, did not anticipate such a practical result, or why did they in language too clear for misinterpretation, direct the proceeds of sale to be paid to the mortgagee. The words of the act, after giving power to decree a sale, are, " that the Chancellor shall have power to order that the money raised by such sale shall be brought into court to be paid to the plaintiff," which it could not have done, if any thing had

been looked to beyond the amount of the mortgage debt; because, where the proceeds were larger than that, such an order would be giving to the mortgagee, more than he was entitled to, and would be stripping the mortgagor of that, which no legislative authority could take from him. The act further proceeds, after directing the trustee appointed to sell, to give bond for the faithful execution of his trust, to declare; "that upon a failure to execute such trust, the *party grieved*, shall have a right to bring suit on such bond, against principal and securities, and *shall recover the money for which the mortgaged premises sold.*" By "*the party grieved*" is necessarily meant, the mortgagee, and not any one, who might be interested in a possible surplus, as well as the mortgagee, or the act would not have made the standard of damages in every such suit *the value of the mortgaged premises.* Had the interest of others been contemplated than the mortgagee, such could not have been the measure of the damages, but they would have been such as are prescribed by the eighth section, that is "*damages which any one interested* had actually sustained. It is conceded, that the mortgagee is within the meaning of the term "party grieved," and if the mortgagor, as is contended, is also within the meaning of the same term, then by the express terms of the act, each would be entitled as their measure of damages, to the value of the mortgaged premises, or the amount of sales. The very statement of such a result, is conclusive to shew, that the construction contended for by the appellees, cannot be the true construction. It constitutes no valid objection to our construction of the act, that the interests of the mortgagor often may as imperiously call for the summary interposition of the powers of the court, as those of the mortgagee. The phraseology used, forbids us to believe, that it was contemplated, he would have an interest in the proceeds of sales, and if it had been so contemplated, there could exist no reason for placing his interest upon higher grounds than the interests of all other persons affected by the other section of this law, and whose only remedy, as regards the sureties, is a suit on the bond;

while for extending this remedy to the mortgagee, if we have rightly defined the design, and policy of the law, there existed the most powerful and conclusive reasons.

No possible evil can grow out of the construction which we have given to this act. The mortgagor has his remedy on the bond by other sections of the law, against the principal and his sureties, if the trustee be faithless to his trust, just as all other persons; and if he desire to call for the exercise of the summary, and inherent powers of the court over the trustee, its own officer, he can have resort to them. This construction will not at all interfere with such exercise of power. That remains as it was before the act, and the mortgagor, upon a proper occasion, may ask for its exertion, just as could a defendant in the courts of common law, have process against a sheriff, who had levied more money upon an execution than would satisfy the plaintiff's debt, and refused to pay it over. But neither in the one court, or the other, would there be any summary remedy against the sureties of either, without positive enactment.

Having thus negatived the power to issue an attachment against the sureties, at the instance of the mortgagor, all steps preparatory to such a procedure, where they assume the character of decretal orders, must be the subject of revision by this court, and are equally invalid, as would be the process affecting the liberty of the sureties. This would seem to follow, as a necessary consequence from the first proposition.

If, therefore, the order decreeing the money to be paid into court, to be paid to the plaintiff, can be at all sustained, it must be upon other grounds.

It is accordingly insisted, that independent of the act of 1785, ch. 72, above adverted to, the appellees have an unquestionable right to the interposition of a court of Equity, upon the ground, that the original trustee's bond was lost.

Upon this assumption, it would become necessary to decide two preliminary questions.

1st. Is the form of proceeding, which the appellees have adopted, the correct form?

2nd. Can objection to the want of form, if any exists, be taken since the act of 1832, ch. 307.

The first question is in fact settled by the construction which we put upon the act of 1785, ch. 72. It could be only under the appellees construction, that there could be any pretence for proceeding by petition, however clear might be their equity under other forms of proceeding. Under the construction which we give the law, the sureties are entire strangers to the cause, to which they have been introduced, and the petitioners are equally strangers to the cause, the fund not being in court, and having no means by the death of the trustee, of operating by the power of the court upon the fund, we cannot perceive upon what ground of principle, or practice, they can be allowed to obtrude themselves into the cause, and litigate a matter however equitable, which is foreign to it, and which is supposed to give rise, to an independent personal claim, arising from the execution, and loss of the bond. And where, if a recovery was had, the amount recovered would in no manner pass to the credit of the cause in which the petition was filed; but would by the decree of the court, pass directly to the petitioner, who would merely use the record in the cause, as a link in his chain of evidence, to establish his right. Further comment on this branch of the case would seem to be unnecessary.

We shall, therefore, next enquire, whether since the act of 1832, ch. 307, any objection can be taken to the form of the proceeding, which was not taken by exception in the Chancery court.

The objection to the proceeding, is, that if the appellees had an equitable remedy, it should have been by bill, and not by petition. The record shews that no such objection was taken in the court below.

The act of 1832, ch. 307, is not a general prohibition as to the raising of points in the appellate court, which were not made below; but is a well defined and specific prohibition, and extends only to the three following cases.

1. The competency of witnesses,

2. The admissibility of evidence

3. The sufficiency of the averments in the bill or petition.

This objection it is quite clear, has no affinity to either class of prohibition, but is excluded by the very terms used. It is an objection to the remedy, a case evidently, not within the contemplation of the Legislature. The law in demanding, that exceptions shall at once be taken to the averments of the bill, or petition, assumes that, the remedy adopted is the appropriate one, but supposes that it may have been defectively stated. It marks too, by its own phraseology, the distinctive remedies pursued in a court of Equity, by referring to averments in bills or petitions, and certainly was never intended, to confound these distinct remedies, by any omission of the parties to interpose their objections.

Whether such a provision would have been wise or advisable, it is not for us to say; but with the law of 1825, ch. 117, making provision both in courts of common law, and in equity, before the law-makers, which in distinct, and unequivocal language, repudiated the raising of any points whatever in the court above, which were not made in the common law courts; and which, as to auditor's accounts in equity, contained precisely the same prohibition, it is difficult to imagine, the same idea was meant to be carried out in this law, when language so totally different has been used; which instead of generalizing, points to, and specifies particular matters, which are to be, and which need alone be, the particular objects of exception below, to enable the party to raise them above.

The views above presented, render it unnecessary to express any opinion on the right of the petitioner to recover in a different mode of proceeding.

*The order of the Chancellor is reversed with costs in the Chancery court, and in this court.*