859 A.2d 168

**David J. SIMARD**

v.

**Elizabeth A. WHITE, et al.**

**No. 96, Sept. Term, 2003.**

Court of Appeals of Maryland.

Oct. 7, 2004.

George Z. Petros, Camp Springs, for petitioner.

Worthington H. Talcott, Jr. (Shulman, Rogers, Gandal, Pordy & Ecker, P.A. of Rockville), on brief for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

CATHELL, Judge.

This case arises out of conflicting claims to the excess funds [1] resulting from a resale after a purchaser defaulted in a prior foreclosure proceeding in respect to property located in

---

1. By excess funds or excess proceeds, we mean, under the circumstances of this case, the difference resulting from a higher bid at the resale than the bid at the initial sale. We use "surplus funds" or "surplus proceeds" to denote the positive difference, if any, between the price at the foreclosure sale(s) and the outstanding lien instrument debt.

Prince George's County.[2] David J. Simard, petitioner, the original and subsequent purchaser, challenges a Court of Special Appeals' decision allowing the contractual waiver of petitioner's alleged common-law entitlement to the excess of proceeds from a property's resale. Elizabeth A. White, Nancy P. Regelin and Patrick M. Martyn (hereinafter, the "Trustees"), together with Washington Mutual Bank, FA, a successor to Home Savings of America, F.S.B. (hereinafter, the "Lender"), the holder of a note secured by a Deed of Trust from Theodore B. McCann are the respondents.[3] The intermediate appellate court's decision overturned the decision of the Circuit Court for Prince George's County, which had sustained petitioner's exceptions to an Auditor's Report following the resale of the property. *See White v. Simard,* 152 Md.App. 229, 831 A.2d 517 (2003).

Petitioner filed a Petition for Writ of Certiorari and this Court granted it on December 18, 2003. *Simard v. White,* 378 Md. 617, 837 A.2d 928 (2003). The sole question petitioner initially presented for our review asks:

> "Whether parties to a power of sale foreclosure may 'contract out' the common law rule that the defaulting purchaser is entitled to any surplus proceeds of resale by placing such a provision in the advertisement of sale?" [4]

We hold that the supposed right of a defaulting purchaser to receive the excess proceeds from the resale of the property

---

**2.** The lien instrument was a deed of trust containing a power of sale. The foreclosure proceedings were conducted under the power of sale. We shall use the terms deed of trust and mortgage interchangeably throughout, although, as we explain later, there is a difference. That difference does not affect the issues in this particular case.

**3.** Hereinafter, the Trustees and the Lender will be sometimes collectively referred to as respondents.

**4.** There was no surplus above the amount of the deed of trust debt. Even after the resale there remained a deficiency. The "surplus proceeds" that petitioner is referring to is in respect to the difference in the resale price above the original sale price—not a surplus above what was owed on the lien instrument. The difference between the two sale prices is what we have noted previously as "excess funds" or "excess proceeds."

is not the common-law of this State. For that reason, we need not resolve petitioner's original question.

After the initial briefing and oral argument, the Court scheduled additional oral argument and requested the parties to brief and address two additional questions proposed by the Court. They were:

1. Should the [alleged [5]] common-law rule that a defaulting purchaser at a mortgage foreclosure sale is entitled to any surplus proceeds resulting from a resale caused by the default, be modified or abolished?

2. If that rule is modified or abolished, and a surplus results at a second sale after a default, should the court otherwise have authority to reimburse the defaulting purchaser from the surplus for the cost of the improvements made to the property by him/her prior to the resale?

We need not answer the first question as we hold that there does not exist in Maryland a common-law rule entitling a defaulting purchaser at a mortgage foreclosure sale to any of the excess funds resulting from a higher bid at the resale caused by the default.

To the second question presented by the Court we respond that, so long as there remains a deficiency in respect to the original mortgage debt, a defaulting purchaser at the first sale is not entitled to claim any of the excess funds resulting from a higher bid at the resale. Further, we hold that if the sum bid at the second sale is both higher than the bid at the first sale and is more than sufficient to pay off the mortgage debt, the defaulting purchaser at the first sale, absent fraud or extraordinary circumstances, still is not entitled to receive any such excess funds in respect to any costs or expenses incurred in making improvements and/or repairs to the property prior to the resale. The total bid price that results in excess funds

---

**5.** For the purpose of our question we had assumed the parties were correct in their belief that such a common-law rule existed. They were not.

reflects the true value of the land and normally such funds are due the original mortgagor, or those claiming through him, junior lien holders, etc.

## I. Facts[6]

Beginning on April 1, 1999, the Trustees advertised the sale of an improved fee-simple parcel of real property located at 5511 Fisher Road, Temple Hills, Maryland (hereinafter, "the property"). The sale was to take place on April 20, 1999, at the steps of the Prince George's County Courthouse. The advertisement specifically enumerated the "TERMS OF SALE." Among these terms were the following provisions:

"The purchaser shall comply with the terms of sale within ten (10) days after ratification thereof by the Circuit Court from Prince George's County, Maryland, unless said period is extended by the Substitute Trustees, their successors or assigns for good cause shown; TIME BEING OF THE ESSENCE. *If the purchaser shall fail to comply with the terms of the sale or fails to go to settlement, in addition to any other available legal or equitable remedies, the Substitute Trustees may declare the entire deposit forfeited and resell the premises at the risk and cost of the defaulting purchaser. In such event, the defaulting purchaser shall be liable for the payment of any deficiency in the purchase price, all costs and expenses of sale, reasonable attorney's fees, all other charges due and incidental and consequential damages.* ***The purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property.*** If the Substitute Trustees cannot convey insurable title, purchaser's sole remedy at law or in equity shall be the return of the deposit." [Emphasis added.][7]

---

6. In accordance with Maryland Rule 8–413(b), petitioner and respondents filed an agreed statement of facts with the Court. Due to the statement's length, we shall include only those facts relevant to the issues in the case *sub judice.*

7. There is no indication in the record that any of these terms were amended orally by the auctioneer at the judicial sale or at the later resale.

Petitioner made the high bid, $53,000, at the first sale on April 20th and signed a Memorandum of Purchase at Public Auction averring to that fact. The memorandum stated, "I, the undersigned purchaser hereby acknowledge that I ... have this day purchased the property described in the attached advertisement, subject to the conditions stated therein. . . ." The sale was ratified by the Circuit Court for Prince George's County on September 24, 1999. As a result of the foreclosure sale being insufficient to pay the secured debt and accrued interest fully, a deficiency of $51,424.34 then remained on the mortgage account.

Petitioner, however, did not complete settlement within ten days after the ratification of the sale by the circuit court, as required under the "terms of sale," and thus defaulted on his purchase of the property. As a result, on December 10, 1999, the circuit court issued an Order Directing Resale Of Mortgaged Property At Risk And Cost Of Defaulting Purchaser, pursuant to Md. Rule 14–305(g). The order provided, "No cause to the contrary having been shown ... it is hereby ordered by the Circuit Court for Prince George's County, Maryland ... that the subject property shall be resold at the risk and cost of the defaulting purchaser, David Simard, and furthermore that the purchaser's deposit is hereby forfeited." The trustees then placed a second advertisement of sale in a local newspaper of general circulation. The relevant terms of this second advertisement of sale were identical to those of the April 1, 1999, advertisement of sale. The resale occurred on February 22, 2000 and petitioner again was the high bidder, with a bid of $101,141.55, and again signed a Memorandum of Purchase at Public Auction, a memorandum with the identical terms as the previous memorandum. As there were no exceptions to the resale, the circuit court ratified the second sale on April 7, 2000. After the bid at the resale there still remained a deficiency as to the mortgage debt.

Petitioner again failed to complete settlement of the resale of the property in a timely fashion, but filed a Petition To Substitute Purchasers for the resale in the circuit court on May 26, 2000. Petitioner asserted that he had assigned his

rights as the purchaser in the resale to Jose W. Barias and Daysi Y. Alvarenga (hereinafter, the "Substitute Purchasers") and the Substitute Purchasers had agreed to go to settlement. Petitioner, however, retained primary responsibility for "all liabilities in connection with the performance of [the Substitute Purchasers'] contract to purchase the property and for compliance with the terms of the sale as set forth in the Trustee's Notice of Sale" (alteration added). This petition was granted by the circuit court on May 26, 2000.

Pursuant to Md. Rule 14–305(f),[8] after ratifying the resale, the circuit court referred the matter to an auditor. The auditor compiled a report on August 2, 2000, which stated that the property's resale produced the excess sum of $46,831.29 above the price bid at the first sale (albeit it was still insufficient to pay the mortgage lien debt in full). The auditor, pursuant to Md. Rule 2–543(e), then authorized the payment of this complete resale price to the deed of trust debt and thus to the original grantor's (mortgagor's) account.[9] The auditor included notes with the auditor's report explaining why the auditor did not authorize the payment of the surplus to petitioner. The notes stated:

"Generally, in the event of a resale which has been ordered by the Court to be 'at the risk and cost of the defaulting purchaser' the property is resold as the defaulting purchaser's 'risk and cost' which means that he has the risk of and is responsible for any decrease in sales price and any additional costs. Likewise, he has the benefit of and is entitled to any excess in the sales price at the resale, less the additional costs. The excess in the sales price resulting from the resale is credited to the defaulting purchaser and *not* the mortgage account.

---

8. Md. Rule 14–305(f) states: "Upon ratification of a sale, the court, pursuant to Rule 2–543, may refer the matter to an auditor to state an account."

9. In other words, the difference between the prices bid at the two sales was applied to the mortgage (deed of trust) debt. According to the figures contained in the record, after the resale price, a deficiency in the mortgage debt still remains.

"However, in the instant case, the trustees' advertisement of sale specifically states that in the event of a resale as a result of default by the purchaser 'the purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property.' In foreclosure sales, the advertisement of sale becomes the contract between the trustees and the foreclosure purchaser, and the 'terms of sale' specified in said advertisement becomes binding between them. As a result of this agreement, the surplus proceeds resulting from the resale have been applied to the mortgage debt as opposed to being awarded to the defaulting purchaser.

"The defaulting purchaser has filed herein a claim against the surplus proceeds and has stated that the reason for the higher price obtained by the trustees at the resale was due to substantial improvements made to the property by him between the time of the first and second sales. However, this claim has not been substantiated and as a result has not been considered by the Auditor in this report. Had this been proven, reimbursement of the cost of said improvements would have been allowed."

As a result of this auditor's report, petitioner filed exceptions in the Circuit Court for Prince George's County and, after conducting a hearing on petitioner's exceptions to the auditor's report, the circuit court found, *inter alia,* that:

"the provision in the advertisement indicating that in the case of a default that the successful purchaser at the first sale (defaulting purchaser) shall not be entitled to any surplus proceeds or profits resulting from a re-sale of property is contrary to the Maryland law governing said circumstance and that no valid consideration existed for the forfeiture of the right of surplus to which the defaulting purchaser would otherwise be entitled. The Court further finds that the language contained in the advertisement cannot operate to alter the principles of law governing entitlement to surplus and that to so allow would be a contract of adhesion and can have a chilling effect on securing foreclosure bids."

That court then remanded the case to the auditor "to re-state his account in accordance with the findings" of the Circuit Court for Prince George's County. On remand, in an April 2, 2001, report, the auditor credited petitioner with the excess proceeds of the resale, but did award respondents $11,951.75 in attorney's fees in relation to the litigation of petitioner's exceptions. Respondents filed exceptions to the auditor's report, "made solely to preserve for appeal [respondents'] claim previously presented to the Court that the terms of the advertisement of sale should have been enforced regarding the surplus," and made a motion "to pay [the] surplus [*i.e.*, excess proceeds] into [the] registry of the court," as opposed to directly crediting petitioner with the excess funds (alterations added).

On July 9, 2001, the Circuit Court for Prince George's County issued an order granting respondents' motion, thus ratifying the auditor's report and authorizing the clerk of the court to accept and hold the surplus proceeds pending further order from the court. On July 24, 2001, the trial court issued an order directing respondents to pay the excess proceeds from the resale, minus the attorney's fees awarded by the trial court, into the registry of the trial court pending further orders from the court. Respondents subsequently paid $29,686.37 into the registry on July 27, 2001. Both parties filed cross-appeals with the Court of Special Appeals.

The Court of Special Appeals reversed the trial court's decision and remanded the case to the trial court for further proceedings, holding that petitioner was not entitled to the excess proceeds of the resale because the specific terms in the advertisement of sale contractually waived petitioner's alleged common-law entitlement to these excess proceeds. The intermediate appellate court did not address the merits of whether the trial court properly awarded attorney's fees to respondents, because it held that petitioner failed to preserve that issue.[10]

---

10. As the parties did not raise this issue on appeal to this Court, we do not address it.

## II. Historical Perspective on Mortgages and Deeds of Trust

Because we are undertaking consideration of a relatively recent alleged common-law provision, it is helpful to address the common-law of mortgages generally in order to add proper perspective to the priority issues the Court is resolving.

The right to private property predated for centuries the Magna Carta.[11] The right of land owners to pledge their

---

11. One of the well regarded works on the origins and purposes of private property is Richard Pipes' *Property and Freedom*, published in 1999. Pipes, twice a Guggenheim Fellow and the Baird Research Professor of History at Harvard University, in addition to analyzing basic private property concepts, includes historical references to the ancientness of private property. He notes that Aristotle, disagreeing in part with Plato, regarded the institution of property as indestructible and ultimately a positive force. Additionally, Pipes notes at page 11 that:

"The main Roman contribution to the idea of property lay in the realm of law. Roman jurists were the first to formulate the concept of absolute private ownership, which they called *dominium* and applied to real estate. . . . For an object to qualify as *dominium*, it had to satisfy four criteria: it had to be lawfully obtained, exclusive, absolute, and permanent. . . . Roman jurisprudence went to great lengths to stipulate every conceivable nuance of property rights: how acquired and how lost, how transferred, how sold. The rights implicit in *dominium* were so absolute that ancient Rome knew nothing of eminent domain."

Pipes also notes at pages 35–41 Locke's thoughts as stated in *Two Treatises of Government*, (first published anonymously in 1690): " '[t]he great and *chief end* . . . of Mens uniting into Commonwealths, and putting themselves under Government, *is the Preservation of their Property*,' " and Rousseau's statement in his *Discourse on the Origin of Inequality* (1755) that " 'The first person who, having enclosed a plot of land, took it into his head to say *this is mine* and found people simple enough to believe him, was the true founder of civil society.' " Pipes also discusses the original assertion of rights to property, which became known as the "Right to First Occupancy" upon which some very early claims to private property were based.

In the concluding chapter, Pipes points out at page 225, what to him may be a continuing problem:

"The rights to property and the liberties associated with them are subverted by a variety of devices, some open and seemingly constitutional others oblique and of dubious legality. . . . The assault on property rights is not always apparent, because it is carried out in the

parcels as security for debt also arose relatively early in the history of the recorded law of property. There are early references in England to the practice that concerned statutes and the common-law regulation of lending practices. In Vol. III of *Statutes of the Realm*, at p. 933, the text refers to a statute passed in the year 1542 to 1543 that addresses an already existing practice in respect to mortgages. That statute, identified as 34 & 35 Hen. VIII ch. 26, provided:

> "That no mortgages of land, tenement, or hereditament, made on and after the saide feaste of Sainte John Baptist, whiche was in the saide XXXiith yere of the reigne of our saide, Soveraigne Lorde, or that hereafter shall be had or made, with in any of the saide Shyres or places, shall be hereafter allowed or admitted, otherwyse thenne after the course of the common Lawes and Statutes of the Realme of Englande: any usage or custome heretofore had to the contrarye thereof not withstanding."

*See also* Richard M. Venable, *The Law of Real Property and Leasehold Estates in Maryland* 177 (1892).

By the early 18th Century, and apparently much earlier, a mortgagee was considered the owner of the pledged property subject to a condition. A debtor who timely paid the debt in full, acquired the right to eject the creditor (mortgagee) if necessary, and re-take complete title to the property. However, if the debt at any time became in default, or the mortgage

---

name of 'common good,' an elastic concept, defined by those whose interests it serves.

. . .

"The notion that every need creates a 'right' has acquired a quasi-religious status in modern America, inhibiting rational discussion" (footnotes omitted). [Footnotes omitted.]

One of the provisions of the Magna Carta was a provision affecting the right of the Sovereign to negate certain private property rights. Over a long period of time prior to the Magna Carta, private property rights in land had been extracted from the Kings of England. Immediately prior to the Magna Carta, the reigning sovereign was attempting to restore to the Crown the property or to reinstate the rights that had previously been forced from the Crown. Accordingly, the Magna Carta did not initially create private property rights in England, as is sometimes said; it protected long extant private property rights.

was otherwise in default, the creditor (mortgagee) was considered the owner of all of the property free of the condition. It did not make any difference whether ninety percent or one percent of the debt was unpaid and in default. Such creditor/debtor arrangements came to be known as "strict mortgages" for obvious reasons. It appears that in early times redemption rights of the mortgagors were also much more limited than present.

Mortgagees, in these early times, apparently utilized ejectment actions as well, even though they were considered to be the owners of all the pledged property, because they had to be able to free it of the condition that might cause a defeasance of their title. In other words, under the lien instruments of the time, even though the mortgagee acquired complete ownership upon default, the mortgage documents (however called) facially created a possibility by way of the condition of a defeasance, reversion or reverter back to the mortgagor. In order to clear title of that condition, mortgagees also used actions at law in ejectment, *i.e.*, ejecting the rights potentially existing by way of the condition.

In explaining the origin of the concept of a mortgage, Venable stated:

"These pledges took the form of estates on condition. The debtor, or borrower, conveyed lands to the creditor on condition that if the money was repaid in a designated time the debtor might reenter or the conveyance was to be void, or the lands were to be reconveyed. This conveyance (or mortgage) transferred to the grantee (or mortgagee) an estate on condition; that is, an estate to be defeated on the performance of a condition subsequent (the payment of the money). Courts of law, of course, recognized this form of conditional estates, as they did other forms; but they held the parties strictly to the very terms and stipulations of the mortgage. If the mortgagor paid the mortgage debt in the time agreed, he thereby acquired a right of entry on the mortgaged premises, and could eject the mortgagee (4 Kent Com. 140). If, however, the debt was not paid in the time

stipulated, he forfeited all interest in the property, and the mortgagee became the absolute owner of the estate. Courts of law thus refused to regard the fact that the real nature and intent of the transaction was that the land was to be held as a security for a debt, and, regarding merely the form of the transaction, insisted on enforcing the rules relating to estates on condition in all their strictness...."

*Id.* Venable went on to discuss the mortgagor's equitable right of redemption,[12] fully established by the time of the reign of Charles I and then known as "the mortgagor's *Equity of Redemption*," where the mortgagor, due to "mishap or misfortune," failed to pay timely the last portion of the debt. Over time, courts of equity had begun to intervene in such situations and began to regard the true intent of the mortgage as a

---

12. The 'equity of redemption' as applied to present lien instrument transactions, is the right to reacquire clear title to property mortgaged to secure a debt, upon repayment of that debt. It, in essence, upon proper payment of the mortgage debt, divests the mortgaged premises of the lien created by the mortgage. The right to redeem, even in a mortgage context, can be itself divested by a valid mortgage foreclosure sale, or by a waiver made subsequent to, and outside the mortgage instrument itself. In *Washington Fire Ins. Co. v. Kelly*, 32 Md. 421, 439–441 (1870), the Court discussed the equity of redemption in a mortgage context (although the case was not a mortgage case):

"Mortgages are now universally regarded, in Courts of Equity, as mere securities for the payment of money,....

"The mortgagor is the substantial owner of the property, though the legal estate is in the mortgagee, and he can transfer or vest his interest at his own pleasure, so long as the right of redemption exists, and the interest of the mortgagor is also liable to attachment and execution.
. . .

"Courts of Equity, though a mortgage be forfeited, and the estate absolutely vested in the mortgagee, at common law, yet they will allow the mortgagor, at any reasonable time, to redeem his estate.... [A]nd no agreement in a mortgage will be suffered to make the property irredeemable.

"Notwithstanding the mortgages upon the property, the mortgagors held the equity of redemption, the real and beneficial estate, equivalent to the fee simple at law...."

Thus, the right to redeem is merely the right of the mortgagor to reassert complete fee simple ownership of the land, upon payment of the debt and any other charges rightly assessed under the terms of the lien instrument or under statutory provision.

security for a debt. Such resulted in "compelling the mortgagee, on tender by the mortgagor of the mortgage debt and interest even after default, to reconvey the property to the mortgagor." *Id.* The courts, however, did not give the mortgagor an indefinite time to repay the debt. The court imposed a time-limit for the mortgagor to repay and under proper circumstances allowed the mortgagee to file a bill to foreclose even after equity proceedings were taken in respect the equity of redemption. This foreclosure of the mortgage to then cut off the mortgagor's right of redemption.[13]

In an attempt to further regulate the foreclosure process, England passed the Statute of 7 Geo. 2, ch. 20 in 1734 (Alex. Stat. 725). That statute stated, in relevant part:

"Whereas Mortgagees frequently bring Actions of Ejectment for the Recovery of Lands and Estates to them mortgaged, and bring Actions on Bonds given by Mortgagors to pay the Money secured by such Mortgages, and for performing the Covenants therein contained, and likewise

---

13. In *Union Trust Co. v. Biggs*, 153 Md. 50, 137 A. 509 (1927), the Court later revisited the concept of the mortgagor's equity of redemption to emphasize the divergence of the interests held by the mortgagor and by the purchaser following the judicial sale. *Union Trust* involved a mortgage foreclosure sale that yielded a surplus after satisfaction of the mortgage debt. The Court determined that Union Trust had neither a legal nor an equitable lien in the excess funds since it did not obtain a judgment until after the foreclosure sale.

"In short, after the sale, equity regarded the property in the land as in the buyer, and the property or the price as in the assignee and mortgagor. It is true that the sale is incomplete until ratified by the court, and that the purchaser's title is an inchoate and equitable one from the day of sale until the final ratification, which, however, retroacts so that the purchaser is regarded by relation as the equitable owner from the time of the sale, and entitled to all the intermediate rents and profits of the estate. Although he thus becomes the substantial owner from the time of the sale and the property is at his gain if it appreciate and at his risk in case of loss by fire or through depreciation, yet, notwithstanding the purchase money be paid, the legal title of the purchaser does not vest until the deed to him is delivered, but, upon its delivery, this deed is not effective merely from the day of its execution, but vests the property in the purchaser from the day of sale. It follows that, after the day of sale, the mortgagor's equity of redemption generally ceases to exist as an interest in land."
*Id.* at 56, 137 A. at 512.

commence suits in his Majesty's Courts of Equity, to foreclose their Mortgagors from redeeming their Estates; and the Courts of Law, where such Ejectments are brought, have not Power to compel such Mortgagees to accept the principal Monies and Interests due on such Mortgages, and Costs, or to stay such Mortgagees from proceeding to Judgment and Execution in such Actions; but such Mortgagors must have Recourse to a Court of Equity for that Purpose; in which Case likewise the Courts of Equity do not give Relief until the Hearing of the Cause; For Remedy thereof, and to obviate all Objections relating to the same; Be it enacted by the King's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Comments, in this present Parliament assembled, and by the Authority of the same, That from and after the first Day of *Easter* Term one thousand seven hundred and thirty-four, where any Action shall be brought on any Bond for Payment of the Money secured by such Mortgage, or Performance of the Covenants therein contained, or where any Action of Ejectment shall be brought in any of his Majesty's Courts of Record at *Westminister*, or in the Court of Great Sessions in *Wales*, or in any of the superior Courts in the Counties Palatine of *Chester, Lancaster*, or *Durham*, by any Mortgagee or Mortgagees, his, her, or their Heirs, Executors, Administrators or Assigns, for the Recovery of the Possession of any mortgaged Lands, Tenements, or Hereditaments,[14] and no Suit shall be then depending in any of his Majesty's Courts of Equity in that Part of *Great Britain* called *England*, for or touching the foreclosing or redeeming of such mortgaged Lands, Tenements or Hereditaments; if the Person or Persons having

---

14. Hereditaments are things capable of being inherited. Corporal hereditaments are permanent objects capable of being inherited, including, but not necessarily limited to, land, *i.e.*, the thing itself. Land is, however, the only "real" corporal hereditament. Incorporal hereditaments are things, rights generally, arising out of corporal hereditaments. *See Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 709 A.2d 749 (1998) and *Cristofani v. Board of Education of Prince George's County*, 98 Md.App. 90, 632 A.2d 447 (1993).

Right to redeem such mortgaged Lands, Tenements, or Hereditaments, and who shall appear and become Defendant or Defendants in such Action, shall at any Time, pending such Action, pay unto such Mortgagee or Mortgagees, or in case of his, her, or their Refusal, shall bring into Court, where such Action shall be depending, all the Principal Monies and Interest due on such Mortgage, and also such Costs as have been expended in any Suit or Suits at Law or in Equity upon such Mortgage ..., the Monies so paid to such Mortgagee or Mortgagees, or brought into such Court, shall be deemed and taken to be in full Satisfaction and Discharge of such Mortgage, and the Court ... may ... compel such Mortgagee or Mortgagees, at the Costs and Charge of such Mortgagor or Mortgagors, to assign, surrender, or reconvey such mortgaged Lands, Tenements, and Hereditaments, and such Estate and Interest, as such Mortgagee or Mortgagees have or hath therein, and deliver up all Deeds, Evidences, and Writings, in his, her, or their Custody, relating to the Title of such mortgaged Lands, ... unto such Mortgagor or Mortgagors, who shall have paid or brought such monies into the Court, ... or to such other Person or Persons, as he, she, or they, shall for that Purpose nominate or appoint." [Footnote added.]

Similar provisions further addressed rights of redemption. Carefully read, this statute provides additional protections for the rights of mortgagors. These statutes modified what had been known as "strict foreclosure" [15] by apparently providing a method for persons, having gone into default, to pay the balance of the entire debt, and retaining and/or recovering their property.

---

**15.** As indicated elsewhere, in strict foreclosure, if any payment was not made, the mortgagee simply owned the property. In other words, if the last 5% of the mortgage debt came into default, the mortgagee could assume all rights to all of the property without regard to its value. There was no common-law process for the judicially supervised sale of the property, with excess above the debt owed going to the mortgagor. The mortgagor simply lost all rights to the property regardless of how much he owed on it.

Nevertheless problems continued to arise, where, as Venable states in *The Law of Real Property*, at p. 178, in reference to the early strict mortgages, that complete forfeitures may have still survived:

"By it the whole mortgaged estate became the property of the mortgagee absolutely, when a portion of it, if sold, might be sufficient to pay the mortgage debt; and, instead of securing to the mortgagee an expeditious payment of the debt, to secure which the mortgage was executed, it might result after delays in transferring to him the property absolutely." [Citation omitted.]

We dealt with such a situation in the case of *Boteler and Belt v. Brookes*, 7 G. & J. 143 (1835), which, although it concerned the rights and obligations of trustees and their amenability to suit, made a full discussion of the Legislature's intent in passing a Maryland statute, 1785 Md. Laws, Chap. 72, that sought to remedy further these perceived problems with the foreclosure process. In that case, a suit was brought "to compel the sureties of a trustee to bring into Court, the proceeds of a sale of mortgaged premises, sold in pursuance of a decree of a Court of equity." *Boteler*, 7 G. & J. at 150. The Court concerned itself with the question of whether it had the power to force the trustee to bring into court the monies received by the sale of the mortgaged property. In answering that question, the Court discussed the implications of the third section of 1785 Md. Laws, Chap. 72, which appears to be an early (the second) Maryland statute authorizing the sale of mortgaged premises, albeit, according to its language it may have been intended only to apply where the lending documents involved the rights of infants and incompetents. The *Boteler* Court, nonetheless, applied it in a case not involving infants or incompetents. The Court quoted from this statute:

"III. AND BE IT ENACTED, That in all cases of application to the chancellor to foreclose any mortgage, he shall have full power and authority, in case the party against whom the bill shall be filed does not pay the sum due upon the mortgage by the time limitted in the decree for paying the same, to order and direct that the mortgaged premises, or

so much thereof as may be necessary to discharge the money due and costs, be sold for ready money, (unless the plaintiff shall consent to a sale on credit,) by a proper person to be appointed by the chancellor, and to order that the money raised by such sale be brought into court to be paid to the plaintiff; and the person empowered to make such sale shall give bond, with good security, to be approved by the chancellor, for the faithful execution of the trust, and full compliance with the order of the chancellor, and upon failure to execute such trust, the party grieved shall have a right to bring suit on such bond, or a copy thereof, against principal and security or securities, and shall recover the money for which the mortgaged premises shall have sold, and the plea of *non est factum*[16] shall not be received, unless verified as aforesaid; and the chancellor may also issue attachment of contempt against the person empowered to sell as aforesaid, and his security or securities, and may thereupon commit both principal and securities until his order shall be fully complied with, and contempts cleared."

1785 Md. Laws, Chap. 72. *See Boteler,* 7 G. & J. at 153.

This statute, in its entirety, imposed upon courts of equity certain requirements protecting the interests of mortgagees in the passing of decrees for the sale of mortgaged property and, subsequent to the statute, when a sale occurred, the proceeds were to apply initially to the costs of the sale, then the principal mortgage debt and then the interest owed the mortgagee. Any surplus, however, apparently went to the mortgagor under this 1785 statute.

The process, prior to this statute, had been known as common-law foreclosure (by way of actions in ejectment at law filed by mortgagees or perhaps in equity to clear clouds on title), and even after the modification brought about by this statute affecting the distribution of the proceeds of sale, this type of foreclosure was still known as common-law foreclosure, although by that time it had been statutorily modified. Com-

---

16. A plea denying the execution of an instrument.

mon-law foreclosures apparently are still viable in Maryland, although, one supposes rare. *See infra.* Common-law foreclosure, unlike foreclosures conducted under powers of sale and assent to decrees, required the completion of a judicial proceeding, and, prior to 1784, the obtaining of a court order in ejectment or some similar order before title could be affirmed in the mortgagee or reaffirmed in the mortgagor depending upon the evidence presented. It is unclear whether, under the prior common-law foreclosures, the courts had the power to provide that the property be sold and direct the disbursement of proceeds in any particular manner. This was clarified by the 1785 statute (and apparently by a 1784 statute as well).

In interpreting the 1785 statute in *Boteler,* this Court further stated:

"The Legislature had, no doubt, a two-fold object in view, in authorizing a sale of mortgaged premises. *As regarded the mortgagor himself, it was [a remedy] in many cases beneficial to him,* as it was calculated to save a portion of his estate from passing to the mortgagee, beyond the power of redemption, *while at the same time, full justice was done to the mortgagee;* who obtained by a sale the amount loaned, and thus effectually reaped the fruits of his security in the most speedy and expeditious manner. The remedy by foreclosure alone, from its tedious character, was calculated to abridge very much this form of security; and with the view of avoiding difficulties sometimes growing out of foreclosures, the parties themselves had introduced, in many cases, the practice of inserting trusts for sale in mortgages. By simplifying remedies, by furnishing speedy redress, and by rendering these securities available according to the design of the parties, in entering into them, in the shortest time practicable, the Legislature, therefore, no doubt designed to encourage this kind of contract and security. While the law held out to capitalists the greatest possible facilities, to the obtention of full indemnity, through the medium of the Courts, it at the same time, gave to those who might desire to take up money on such securities, much

more ample means of accomplishing their object. These too, were designs well deserving the attention of the Legislative body, presiding as it does, over the interests of a commercial community, where every effort to bring into captivity unemployed capital, is necessarily calculated to advance the interests of the State. *Such objects are clearly designed by the Act of 1784,*[17] *which appears to be the first law authorizing the sale of mortgaged premises,* and which furnished encouragement to foreigners to lend their capital to citizens of the State; and the Act of 1785, ch. 72, was but the carrying out of the same great objects among our own citizens, by extending the authority to sell, in all cases of mortgages, where a default had occurred in the payment of the money secured to be paid.

"Providing thus the means by a sale, and summary process, for the extinguishment of the mortgaged debt, it was evidently that which was solely looked to, and not the interest of the mortgagor, or any person who might, as his assignee, be incidentally interested in any possible surplus; for as has been very justly observed, *it was not contemplated that more should be sold than was necessary to extinguish the debt due on the mortgage. And when the remedies by the third section are provided, they look only to such sum as would accomplish that object.* If indeed the law could have a practical operation, by limiting the sales in all cases, to the exact amount of the mortgage debt, such a proceeding would reach with precision the object of the Legislature. *But it is impossible in anticipation to know, that a given number of acres will produce a specific sum of money, and as a sum of money equivalent to the mortgage debt has to be raised, the trustee, to carry the Act into effect at all, even where the decree limits him to the sale of only so much as may be necessary to satisfy the debt, must necessarily often have a surplus in hand, which must*

---

17. We have found no earlier cases that mentioned or discussed the 1784 statute. Accordingly, the *Boteler* discussion presents the first understanding of this particular statutory scheme.

*belong to the mortgagor* or those, who, in the eye of a Court of Equity may represent him."

*Boteler*, 7 G. & J. at 151–52 (emphasis added) (footnote added). It is clear that the *Boteler* court interpreted the Legislature's intent in passing this statute, in substantial part, to be to protect the interests of the mortgagor to recover any excess value of his land realized as a surplus at a sale above the amount of the mortgage debt.

According to another of our early decisions, this Act and the Court's interpretation of it, did not remove common-law foreclosure, or apparently even altogether eliminate strict foreclosure, but merely added another remedy to address default, a foreclosure by judicial sale and advanced in the statute certain protections for the mortgagors. In *Andrews v. Scotton*, 2 Bland 629, 666 (1830), although that case did not involve a mortgage foreclosure but a judicial sale arising out of an estate matter, with a subsequent default, the Court compared mortgage foreclosure sales, saying:

"The Court has been authorized by an Act of Assembly to decree a sale of the mortgaged property; 1785, ch. 72; s. 1, 2 and 3; 1837, ch. 292; but the provisions of that Act have been always considered as having merely introduced an additional remedy, and not as having abrogated any pre-existing mode of relief, to which the mortgagee was entitled, or to have altered the proceedings in this Court on mortgages, in any other respect whatever, and therefore, the mortgagee may now, notwithstanding the provisions of that law, have a decree of foreclosure instead of a decree for a sale."

By the time of Venable, the foreclosure by sale had "practically supplanted" the strict foreclosure in Maryland. *See* Richard M. Venable, *The Law of Real Property* 178 (1892). *See also Pannell & Smith v. Farmers Bank of Maryland*, 7 H. & J. 202 (1826); 4 Kent Com. 181. A problem continued to exist, however, in that the mortgagee still had to commence to proceed, first by way of a bill of equity in order to foreclose a mortgage. To remedy this problem, mortgagees began the practice of inserting "power of sale" provisions into their

mortgages. As Venable defines it, power of sale provisions "expressly stipulated in the mortgage that, on default by the mortgagor, the mortgagee might sell the property in the manner and on the terms specified in the mortgage," without obtaining a prior decree authorizing the sale. Richard M. Venable, *The Law of Real Property* 179. In discussing power of sale mortgage provisions, Venable said:

"Courts of equity in England recognized and enforced these powers. The great objection to them was that they committed a power to the mortgagee which was not compatible with his relation to the mortgagor. He was practically a trustee to sell for the benefit of himself and of the mortgagor; but his interests were not identical with those of the mortgagor, and he was subjected to a temptation to abuse the position of trust which he occupied by not exerting himself to sell to the best advantage. In some of the United States the courts of equity refused to recognize these powers, and in others they were viewed with such disfavor that *Deeds of Trust to Secure* supplanted mortgages with powers to sell (3 Md. 96–7).

"In these deeds of trust the borrower conveyed the property intended to secure the debt, not to the lender, but to some third person, and empowered him to sell on default (4 Kent Com. 146–7). In Maryland, however, mortgages with power to sell were recognized and the power enforced; but in order to remove all doubt as to the right to exercise such powers (3 Md. 96), and to remove the manifest objections to such mortgages, Acts were passed to regulate the exercise of the power and prevent its abuse (1785, c. 72; 1825, c. 203; 1826, c. 192; 1833, c. 181; 1836, c. 249, 1874, ch. 460; 1878, c. 483; codified in 2 Md. C. Art. 66, ss. 6–20). These Acts clothed the mortgagee with the responsibilities and duties of a trustee, and strictly directed the method of his procedure in exercising his power to sell. And, in order to prevent the mortgagor from hampering the mortgagee by filing bills in equity to enjoin him on frivolous pretexts intended to delay or gain time, the mortgagor's right to enjoin was restricted to certain specified cases (1826, c. 292;

1836, c. 249, codified in 2 Md. C. Art. 66, ss. 16–18). In consequence of these provisions the mortgage with a power to sell is by far the most prevalent form of security in Maryland, although deeds of trust to secure may exist and are of frequent occurrence."

*Id.* (emphasis added).

This Court, in *Charles v. Clagett,* 3 Md. 82 (1852), set out a brief background as to power of sale clauses. Judge Eccleston, speaking for the Court, stated:

"Mortgages with power of sale, are treated of at *marg. p.* 124 of *1 Coote, (69 Law Lib.) 170;* and this authority was much relied upon by the appellant's counsel, as sustaining his view of the subject. Where the power of sale is given to a mortgagee himself, or to a third person, merely as a naked power to sell, it need not, nor do I presume that it does, at all, impugn or interfere with the ordinary and usual rights of a mortgagee, which exist in a mortgage, similar, in all other respects to such a deed, except in regard to this power. But when the estate is conveyed to a third party in fee, in trust to sell, the deed is but a *quasi* or equitable mortgage.

"This power of sale is regulated in New York and some other States by statutes.

"Our act of 1825, ch. 203, on this subject, particularly the third section, has been insisted upon by the appellant's counsel, as conclusive authority, for holding the present deed to be a mortgage within the meaning of the act of 1846.

. . .

"According to my opinion, this provision relates to such mortgages as give *special powers* of sale to the mortgagees, or to others: the *special powers* to others meaning merely *naked powers,* and not conveyances of estates, to third persons in trust, to sell.

"At one time doubts were entertained as to the validity of sales, under *powers* contained in mortgages, unless made with the concurrence of the mortgagor, or the sanction of a

court of equity. And it would seem that some such consideration induced the legislature to pass the act of 1825...."

*Id.* at 95–96. In *Charles* the Court, as indicated above, recognized that the Legislature sought to clear up any doubt as to the validity of a power of sale mortgage when it enacted the Act of 1825, ch. 203. That Act, in relevant part, stated:

"4. *And be it enacted,* That all such powers to mortgagees made, or to be made, authorising sales, shall be executed, acknowledged and recorded as deeds and conveyances usually are before the conveyances for the sale be executed, and every such sale [under a power of sale contained in a mortgage] shall be at public auction or vendue, and public notice shall be given thereof by advertisements....

"5. *And be it enacted,* That in every case ... an affidavit ... by the printer ... and also an affidavit ... by the person who fixed the [advertisement] upon the [court house] door; and also, an affidavit stating the circumstances respecting the sale ... made by the person who acted as auctioneer at the sale ... shall be received in every court of law or equity in this state, as prima facia evidence of the facts in such affidavit set forth." [Alterations added.]

This statute evidences an early statutory authorization, or acceptance, of foreclosure sales under powers of sale contained in mortgages, in that it addressed and resolved problems that had apparently arisen in those types of foreclosures. It did so by enacting requirements for the sales and the reporting of the sales to the courts.

Venable next notes that the City of Baltimore sought greater protection of mortgagees' interests than was provided by the Act of 1825. This greater protection, then applicable only in the City of Baltimore, first was provided by the Act of 1833, ch. 181.[18] This Act specifically stated, in relevant part:

---

18. For later versions of this statute, see 1836 Md. Laws, Chap. 249; 1839 Md. Laws, Chap. 9; 1852 Md. Laws, Chap. 148, 198, which were codified in 1 Md. C.P.L.L. Art. 4, §§ 692–704.

"Sec. 2. *And be it enacted,* (in order to the facilitating the enforcement of mortgages of real property and estate in the city of Baltimore,) that in all cases of conveyances by way of mortgage of lands or hereditaments or chattels real, situate in the city of Baltimore, and where in the said conveyances the mortgagor shall declare his assent to the passing of a decree as hereinafter mentioned, it shall and may be lawful for the mortgagees or their assigns, at any time after filing the same to be recorded, to submit to the Chancellor, or to Baltimore county court or any Judge thereof, the said conveyances or copies under seal of said county court thereof, and the said Chancellor or court or Judge aforesaid, may thereupon forthwith decree, that the mortgaged premises shall be sold...." [Footnote added.]

As the text of the statute reveals, the Act of 1833, ch. 181 permitted a particular type of mortgage commonly referred to in the present day as an "assent to decree" mortgage or lien instrument. As Venable states, this type of security provides:

"[T]hat the mortgagor may incorporate in the mortgage an assent on his part to the passage of a decree in equity for the sale of the property on his default. Under this consent the mortgagee may, immediately on taking the mortgage, file an *ex parte* petition for a decree of sale to be made on default; and, immediately on default, the trustee appointed in the decree may proceed to make sale in conformity with the terms of the decree; or the mortgagee may file his *ex parte* petition after default and have a decree for the sale."

Richard M. Venable, *The Law of Real Property* 180. Evidently, because the statute originally only provided "assent to decree" foreclosures in Baltimore City, the particular process became prevalent in that jurisdiction—and remains so. It is less frequently utilized in other jurisdictions, even though they are now authorized statewide. *See* Md.Code (1974, 2003 Repl. Vol.), § 7–105 of the Real Property Article.

In the case of *Hays v. Dorsey,* 5 Md. 99 (1853), this Court affirmed a decree of the Superior Court of Baltimore City, which was sitting as a court of equity, that had directed the

sale of mortgaged premises.  *Hays* dealt with a mortgage that was duly executed pursuant to the Acts of 1833 and 1836.  We stated that "[t]he mortgagor, by executing his conveyance under the act, gives *his 'assent'* to the passage of the decree; and so far as the authority of the court to pass it is involved, it is only necessary to file a petition and the mortgage."  *Id.* at 101.

With respect to foreclosures pursuant to an assent to a decree, this Court, in *Ahrens v. Ijams,* 158 Md. 412, 148 A. 816 (1930), said:

"[T]he mortgagees had at their command two plain remedies which were prescribed by statute, whereby they could at one time and in one proceedings sell the entire lot, by beginning, either in the city or the county, [at the time of the mortgage, the property was intersected by the boundary between Baltimore City and Baltimore County and the mortgage was recorded in both jurisdictions] a bill of complaint for foreclosure in accordance with ancient equity practice [common-law foreclosure] or a sale under the power specifically conferred by the mortgage upon the mortgagees, their personal representatives or assigns, or their attorney named in the mortgage.  *Supra;*  Code, art. 16, secs. 90, 92;  art. 66, sec. 15;  *Baltimore City Charter & [Public Local Laws]* (1927), art. 4, sec. 730, p. 438;  *Miller's Equity Proc.,* secs. 445–447, 452–458, 472.  Instead of choosing either of these two methods, the mortgagees availed themselves of the third remedy of a foreclosure under assent to a decree.  By this election the mortgagees, and those claiming title as successors in title to the purchaser at the mortgage foreclosure sale, are bound. . . .

"The practice of a foreclosure sale under an assent to a decree originated with the Act of 1833, ch. 181, and has continued to the present.  It affords a summary remedy for the benefit of mortgagees.  Its operation is limited to cases where the mortgagor has in the mortgage deed declared his assent to the passage forthwith of a decree, in conformity with the provisions of the act, providing, before default, for a sale of the mortgage premises.  The proceeding is *ex*

*parte* until after the decree and a sale under the decree. In order to obtain the decree it is only necessary to file the mortgage and a petition for the decree. No summons is necessary, and no notice is required to be given to the mortgagor or any person claiming under him, and neither prior nor subsequent mortgagees or incumbrancers need be made parties. The mortgagee is entitled to the decree at any time after the recording of the mortgage, and without regard to default. If there has been no default, the decree is entered prospectively. If no default occurs, it never becomes effective, but, should there be a default afterward occurring, the decree is enforced. See *Miller's Equity Proc.*, sec. 474 *et seq.*"

*Ahrens*, 158 Md. at 417–18, 148 A. at 819 (alterations added).

Thus, the historical differences between power of sale and assent to decree foreclosures is that the former was created initially by the common-law and later formalized by statute while the latter is purely a creature of statute. Therefore, when necessary to examine the respective foreclosures, common-law history may be important in respect to strict foreclosures, common-law foreclosures and power of sale foreclosures, but relatively unimportant in assent to decree foreclosures.

As of 1892, when Venable published his *The Law of Real Property,* he stated that mortgage law was regulated in the following manner:

"Mortgages with power to sell, being regulated in Maryland by general law applicable to the whole State, are in the city of Baltimore called *County Mortgages,* although they may and do exist in the city of Baltimore. Mortgages with an assent to a decree, being regulated by local law, exist only in the city of Baltimore, and are generally called *City Mortgages.* Mortgages in which there is neither a power to sell nor an assent to a decree are called, by way of distinction, *Common Law Mortgages.*"

Richard M. Venable, *The Law of Real Property* 180 (footnote omitted). Venable also points out that it was common at that

time, in Baltimore City, to have both an assent to a decree *and* a power of sale provision within a single mortgage. *Id.*

Currently, the Maryland Rules state that " 'Power of sale' means a provision in a lien instrument ['mortgage, a deed of trust, a land installment contract,' Md. Rule 14–201(b)(5) ] authorizing a person to sell the property upon a specified default," Md. Rule 14–201(b)(6), and that " 'Assent to decree' means a provision in a lien instrument declaring an assent to the entry of an order for the sale of the property subject to the lien upon a specified default," Md. Rule 14–201(b)(1). Both types of mortgage provisions are now governed by the current Maryland Rules, and are, as we have indicated, authorized by Md.Code (1974, 2003 Repl.Vol.), § 7–105 of the Real Property Article.

A short note on the advent of deeds of trust is in order in that the lien instrument in the present case is a deed of trust with a power of sale. As used in the case at bar, and as such lien instruments are often used, they operate much as would a mortgage with a power of sale, except that the trustees would be exercising the power, not the mortgagee or mortgagee's assigns.

Deeds of trust apparently came into being in this country as a result of the harshness of "strict foreclosure," and as an intellectual reaction to mortgages with powers of sale included.

In his 1892 treatise, Venable describes the distinctions between deeds of trust and mortgages:

"It has already been seen ... that a debtor may pledge his lands as a security by conveying them to a third person in trust for the creditor, as well as by conveying them directly to the creditor as in the case of a mortgage. Conveyances of property, as a security or indemnity to some person other than the person secured, are called *deeds of trust to secure,* or simply *deeds of trust* or *trust mortgages.* They differ from technical mortgages in their *form and manner of execution* and in the *rights of the parties.*

"... The parties to a mortgage are the mortgagor (debtor), and mortgagee (creditor). The parties to a deed of trust to secure are the grantor (debtor), the grantee (trustee), and the *cestui que trust* (creditor)....

. . .

"... In Maryland where a debtor wishes to secure a creditor by a pledge of lands the mortgage is the common form of security, although the deed of trust is frequently used in such cases. But where the number of creditors to be secured is great, and the bonds or notes or debts secured are held by different persons, who may assign them with or without endorsement, it is almost a necessity to use the deed of trust.... And so where a number of creditors are to be secured, the deed of trust is practically in universal use.

. . .

"... The *grantor's* rights are usually stated in the deed....

"The rights of the *cestui que trust* are those of *cestuis que trust* generally, except as modified by the terms of the deed. The creditors are strictly *cestuis que trust* and not mortgagees. They have no right, consequently, on default, to take possession of the property and apply the rents and profits to the payment of their claims; nor have they any right of foreclosure such as a mortgagee would have under a technical mortgage (3 Md. 82, 94–5). Their only remedy is to compel the enforcement of the trust according to its terms (45 Md. 396, 408).

"The rights and duties of the *grantee* (trustee) also depend on the terms and conditions of the deed."

*The Law of Real Property* at 253–55.

Even prior to Venable's *The Law of Real Property,* Richard H. Coote, in his *A Treatise on The Law of Mortgage* (1837), discussed powers of sale in reference to both regular mortgages and deeds of trust. Coote stated:

"It is now frequent in practice to give the mortgagee a power of sale.... The modes of accomplishing this are various. In some instances, the estate is limited to the use

of the mortgagee for a term of years, with the usual proviso for redemption, and subject thereto to the use of trustees in fee upon trust to sell. . . . [A]nd, in other instances, it is limited to the mortgagee in fee, with the usual proviso for redemption, attended with a declaration, that if default is made in payment at the given time, it shall be lawful for the mortgagee, his heirs or assigns, after notice in writing requiring payment, to sell, . . . Either instance is valid and effectual, but the latter is most to be recommended; for on breach of the proviso, it bestows on the mortgagee an absolute estate; and at the end of a further time gives him a power of sale; and leaves open to him the option, in the mean time, of filing his bill to foreclose."

*A Treatise on the Law of Mortgage* 55 (alteration added).

So while the instruments, as most often used, are similar in operation, there are many more uses of deeds of trust than are practical for mortgages. Multiple bond holders, multiple creditors, the need for the identity of the ultimate beneficiaries to remain unknown, etc. are all practical in a deed of trust format and impracticable, or impossible, under a mortgage format. Often, for commercial lenders particularly, deeds of trusts are much more efficient, while for private lenders not in the banking or mortgage business, the use of the mortgage format may be more efficient.

Since perhaps as early as pre-Magna Carta times, and certainly no later than the early 18th Century, there have been four types of mortgages (and deeds of trust) and four modes of foreclosure. There have been "strict mortgages," "common-law mortgagees" (and perhaps common-law deeds of trust), mortgages with "powers to sell," and mortgages with "assent to decrees." Common-law mortgages contain no "power to sell" or "assent to decree" provisions. Some mortgages and deeds of trust may contain both a "power to sell" and an "assent to decree."

Similarly, there have been "strict foreclosures," common-law foreclosures, foreclosures under powers to sell and foreclosures under assents to decree. "Strict mortgages" and

"strict foreclosures" have not survived the test of time and have been statutorily rendered obsolete. Common-law mortgages and common-law foreclosures have survived, although their use is now rare because almost every mortgage or deed of trust contains either a power to sell or an assent to decree provision. However, if a drafter forgets to include one or the other of the last mentioned provisions, all is not lost—a common-law foreclosure can still occur, although one supposes that, at least currently, it is a rare practitioner who will come across a common-law mortgage. In other words, if a modern mortgage contains neither a power of sale or an assent to decree, the mortgagee, upon default of the mortgage debt, can still file a Bill of Complaint requesting relief, including a judicial sale of the property.

## III. Discussion

With this historical perspective to guide us, we address the issues in the present case, especially the alleged common-law rule, said to have been created by this Court's relatively recent case law, *i.e.,* common-law, that a defaulting purchaser is entitled to any excess funds from a resale of mortgaged premises. We next comment on the specific history, or lack thereof, of this alleged rule.

One of the first Maryland cases involving the measures to be taken upon a default by a purchaser at a judicial sale was *Andrews v. Scotton,* 2 Bland 629 (1830), on remand after a prior Court of Appeals' decision in *Anderson v. Foulke,* 2 H. & G. 346 (1828). It is important to note that, while the sale was a judicial sale, *it was not a mortgage foreclosure sale.* It was a judicial sale arising out of the administration of an estate. Scotton had contracted to purchase from Andrews property that Andrews had purchased from another (but had not yet received a deed thereto). There was no mortgage or deed of trust ever executed. Scotton had made several payments on the property to Andrews, but still owed a considerable sum when he died. Upon his death it was discovered that he was insolvent. As a way out, the parties went into court and had the court decree a judicial sale in reference to his estate. The

high bidder at the sale, Anderson, subsequently defaulted, after claiming (and losing on the claim) that the title to part of the property was not clear. The Chancellor initially directed that Anderson be put in "detention" for contempt for failing to go through with the purchase.[19] Upon appeal to the Court of Appeals, it upheld the power of the Chancellor to hold Anderson in contempt and to order a resale of the property.

At several points in the various proceedings, both before the Court of Appeals' initial decision and after it, the Chancellor noted:

"The manner of sending property into the market, as well as the mode of sale, generally adopted in this State, differs, perhaps, in some particulars, from that of other countries. The form of ordinary sales of merchandise by auction is the same in this State as in England. But the mode of making a sale of property under the authority of the Court of Chancery in England is different. . . .

"In this State the manner and terms of sale are particularly prescribed in the decree; and the trustee is directed to conform thereto. . . .

. . .

"But whatever variety or difference may exist as to the mere modality of sale, the intentions and general objects are the same every where and in all cases. The benefit of the interested parties, for whom the Court makes the sale, is always and chiefly regarded. . . . To attain them [the ends intended], in England, if after the biddings are closed, anyone else comes in and offers a much higher price, the biddings may be opened, and the additional offer accepted. This phrase of 'opening the biddings,' which, in the English books, occur so frequently. . . . In this State, there has been no instance of opening the biddings. . . .

. . .

---

19. Apparently, defaulting purchasers in the early nineteenth century still were subject to incarceration under the theory that the failure to pay the purchase price due from a judicial sale arising as a result of estate administration was a contempt.

"From these authorities it appears to have been the settled law of the English Court of Chancery long before, and ever since our Revolution, that on a purchaser's failing to comply, the Court would, on application, after the ratification of the sale, compel him to complete his purchase by process of attachment for contempt. [In other words, the defaulting purchaser would be locked up. It appears that there was then no other remedy in Maryland.]

. . .

"It is a clear and well settled principle of this Court, that where [estate] property has been sold under its decree, the Court, as the vendor for the benefit of those interested, retains an equitable lien for the payment of the purchase money. The most usual way of enforcing this lien, has been by petition of a party interested, setting forth the facts, and praying that the property may be re-sold to pay the balance of the purchase money. And a sale may be ordered accordingly, at the risk of the delinquent purchaser."

In concluding, the Chancellor ordered:

"And it is further decreed, that the trustee . . . bring into this Court, all sums of money he may receive or recover in any of the modes hereinbefore specified, and make report of his proceedings accordingly, to the end, that no more may be collected by the said several modes of proceeding, than one entire satisfaction of the whole amount of principal, interest and costs, which ought to be paid by the said Samuel Anderson."

*Andrews*, 2 Bland at 642–70 (alterations added) (citations omitted).

As can be seen, this case is silent as to the distribution of excess funds remaining after accounting for the original purchase price from Scotton, but primarily concerned itself with the alternatives available in 1830, when a purchaser defaulted, *i.e.*, incarceration for contempt or a resale at the risk of the defaulting purchaser. The Court explicitly "reserved" a resolution as to the excess sum distribution. If the Chancellor believed at the point of time of a resale that the excess

proceeds at the second sale automatically belonged to the defaulting purchaser at the first sale, there would have been no need to reserve determining the distribution of the excess until Scotton's creditors were notified, because the proceeds would not have inured to Scotton's estate in the first instance, but to Anderson, and thus would not have been available to creditors of Scotton's estate. This case, accordingly, is not a case supporting a common-law holding, even in sales arising out of estate matters, that such a defaulting purchaser is entitled to excess proceeds upon resale.

While *Andrews* and *Anderson* concerned the remedies against defaulting purchasers, which included a resale, the next Maryland case more directly involved the matter of the distribution of excess proceeds at a resale above the proceeds at the original sale. But again, the sale, while a judicial sale, was not a mortgage or deed of trust foreclosure sale. In other words, there was no private contract involved. In *Mealey v. Page*, 41 Md. 172 (1874), the original sale was conducted by an executor under a power of sale contained in a will for the purpose of being able to make disbursements to the heirs of the testator. There was no debtor or creditor involved; there was no possibility of a deficiency decree simply because it was not that type of judicial sale. The purchaser defaulted, and, pursuant to a statute, the court ordered a resale of the property at the risk of the defaulting purchaser. At the resale the bid was higher than the bid at the original sale. The first sale was under a power granted by will, and the second sale conducted pursuant to a statute. Neither arose under an instrument of indebtedness. The Court stressed that all of the proceedings leading to that particular order of resale, had treated the property to be sold at the resale as the property of the defaulting purchaser.

In the instant case, however, upon the failure of the property to bring in a sufficient sum at the original sale, a large deficiency remained, and even after the resale, a deficiency still remained. In both sales in the instant case, it appears that the property being sold was being sold pursuant to the rights of the mortgagee and in which the mortgagor retained

rights to see to the sufficiency of the purchase price and the methods of sale, even as to the resale. The two advertisements were identical in identifying the property to be sold as that encumbered by the debt of Theodore B. McCann, and the advertisement for the resale made no mention of there having been an initial sale. Therefore, in each sale the property was sold as that of the debtor. In other words, it would appear that the original mortgagor retains rights to challenge the procedures, advertisement, etc. at the second sale, in order to protect himself from a deficiency. The situations in *Mealey*, in comparison with the present case, and with lien instrument foreclosure sales generally, accordingly, are very different.

In *Mealey*, the Court noted that the resolution of the issue as to whom the excess funds in that type of case belonged depended upon:

"[A]nother question, and that is, whether the property sold at the re-sale was sold as the property of the first purchaser, or as that belonging to the estate of the testator, without reference to any rights or liabilities growing out of the first sale."

That Court resolved the issue under the circumstances there present, answering:

"Instead of rejecting altogether the appellant's [original defaulting purchaser] claim to the surplus proceeds of the re-sale, the Orphans' Court should have disposed of the product of that sale in the following manner: First, by deducting the costs and expenses attending the re-sale, including a reasonable fee for services of counsel in filing petition and procuring the necessary orders thereon for re-sale; secondly, by deducting the executor's commissions on the whole amount of the proceeds of the re-sale; thirdly, then the amount of the original purchase money, with interest thereon from the date of the first sale to the time of the receipt of the purchase money by the executor from the purchaser at the second sale; and, lastly, after all these deductions, whatever balance of such proceeds of re-sale

may have remained, should have been awarded to the appellant."

*Id.* at 185–86. As is clear no mortgage debt or lien was involved in *Mealey.*

A crucial difference in estate sales as contrasted with lien instrument foreclosure sales, is that in estate sales there is no debtor, and thus, there is no possibility of a deficiency as to the mortgage debt. Moreover, in mortgage and deed of trust transactions, the mortgages or deeds of trust are actual conveyances of property to the mortgagee or trustee, with conditions that cause a defeasance of title upon the satisfaction of the indebtedness. And in the sale procedures, the selling entity is charged with making appropriate efforts to generate proper prices, not only to address the satisfaction of the debt, *i.e.,* protecting the creditor, but also to protect the interests of the mortgagor, *i.e.,* to realize the full value of the land. As indicated, resales generated during proceedings arising out of lien instrument indebtedness foreclosures, encompass much more extensive interests than the interests of the parties in *Mealey* and its predecessors.

The next case involving this general issue, *Early v. Dorsett,* 45 Md. 462 (1877), also arose out of estate issues and did not involve liens of indebtedness. Again, the court decreed a sale "of real estate devised by will," for the purposes of distribution amongst the devisees. The original purchaser, Sasscer, first complied with the terms of sale which required him to give bond for the balance of the purchase price. However, before he paid the balance of the purchase price and had received a deed, he mortgaged the property to Early. Thereafter, Sasscer defaulted on the balance of the purchase price he had bid at the original estate sale, and thus never received legal title to the land, but had nonetheless mortgaged it. The court ordered a resale in respect to the original sale arising out of the estate administration. Early thereafter recovered a separate judgment (based upon the debt secured by the invalid mortgage) in another separate case against Sasscer (the defaulting purchaser who had mortgaged the property to Early), and issued an attachment against Sasscer and caused

it to be laid in the hands of the selling trustees as to any and all proceeds from the second estate sale that might belong to Sasscer. No mortgage foreclosure sale was involved in the actions. Early then assigned his interest in the judgment to Dorsett and others. Sasscer, Early, Dorsett and others then began to fight over who was entitled to the total proceeds. The total proceeds included the deposit sum that Sasscer had actually paid pursuant to the original sale and the price paid at the second sale. Presumably the total of those sums exceeded Sasscer's bid at the original sale. The Court states the difference as being $1,718.55. Therefore, technically, the case did not involve a bid at the second sale in excess of the bid at the first sale, but a combining of the actual cash deposit paid at the first sale before default and the bid price at the resale. Additionally, although there was a mortgage involved (Early's from Sasscer), that mortgage was not an instrument generating the judicial sale involved in that case and *Early* did not involve a mortgage foreclosure sale under that, or under any mortgage, although one of the issues was whether and what amount of the proceeds Early and or his assigns might be due. The original sale and the resale were primarily sales to produce funds for distribution in an estate. The Court then relied on *Mealey:*

> "The grounds upon which in a case like this, where there is a re-sale at the purchaser's risk, to enforce payment of unpaid purchase money, the purchaser is held responsible for the deficiency, and is entitled to the surplus resulting from the re-sale, are very fully stated in the recent case of *Mealey . . . .* "

*Id.* at 466. Accordingly, the first three Maryland cases on the general subject did not involve sales arising out of private contracts, *i.e.,* mortgage foreclosure sales, but were sales arising out of estates in order to raise funds for distribution to heirs or other distributees. There were no debtors and creditors directly involved. We find this to be instructive. In those cases there were no other interests to be protected, such as the contractual interests of mortgagees to recover all sums due them, or the contractual rights and interests of mortga-

gors to protect themselves from deficiency decrees or to recover any equity representing land value due to them for the value of the land over and above the amount of the mortgage debt.

Although it is not entirely clear, it appears that *Brundige v. Morrison,* 56 Md. 407 (1881), also involved proceedings arising out of estate matters. It involved the sale of personal property, and does not appear to have involved any lien instrument. In that case the Court, consistent with the three previous cited cases, held that the original defaulting purchaser was entitled to any excess proceeds between the prices at the second sale and the prices at the first sale. The second sale was a private sale and it is unclear whether the first sale was a private or public sale. The opinion itself cites to no prior cases, although the synopsis contains a reference to *Anderson* (on "risk to the defaulting purchaser issue") and the earlier case of *Billingslea v. Baldwin,*[20] 23 Md. 85 (1865). *Billingslea* appears to have no relevance to the present issue, or to the issue it was cited to in *Brundige.*

*Aukam v. Zantzinger,* 94 Md. 421, 51 A. 93 (1902), appears to be the first case in which the Court opined, albeit only as dicta, in the context of a lien instrument foreclosure sale and subsequent resale upon default by the original purchaser, that the defaulting purchaser from the first sale was entitled to the difference in the price paid at the second sale as it related to the first sale, if the second sale price was higher than the first sale price. In the case the Court said, as dicta:

" 'The proceedings for a resale, after final ratification, treat the first contract as binding on the original purchaser. The property is resold as the property of the defaulting purchaser, and at his risk. He is therefore entitled to any excess in the proceeds of sale at the resale, just as he would

---

**20.** *Billingslea* also arose out of estate matters involving reversionary interests in real property, and the proceedings appear to be in the nature of complaints for a partition sale. It did not involve a foreclosure of a mortgage or deed of trust.

be responsible for any deficiency.' *Miller's Eq. Proc.*, 620 (sec.526), and cases cited."

*Aukam,* 94 Md. at 427, 51 A. at 95. The only cases cited in the section of *Miller's Eq. Proc.* are *Mealey, Early* and *Brundige,* discussed *supra,* none of which involved mortgage or deed of trust foreclosure sale and resale proceedings.

The actual holding in *Aukam,* however, was that the defaulting purchaser at the first sale had a right to file exceptions to the ratification of the second sale because under the aforementioned cases, the court believed that he might be entitled to excess proceeds because he was responsible for any "shortage." Defaulting purchasers may well have standing to file exceptions to the manner in which a resale is held because of their continuing liability for "shortages," but that circumstance in and of itself, affords them no claim to any excess sums bid at the resale. Once the sum received at the resale is above the price bid at the initial sale and also covers the costs of both sales, there is no "shortage" for which he may be liable. At that point he has no remaining interest to protect in the resale or any claim to proceeds from the resale.

Thus, it is at this point in the evolutionary process, that the language, apparently dicta, in our *Aukam* decision in 1902, that the alleged common-law rule that a defaulting purchaser at a mortgage foreclosure sale is entitled to excess proceeds at resale caused by his own default, came into being in this State. In other words, prior to our 1902 *Aukam* decision, it had not been clearly stated (if stated at all) in Maryland. Additionally, in conducting our research into the early origins of lien instrument law in England, we have uncovered no mention of it in the pre-Revolution era of that country. It is a rule (if it is a rule) that appears home grown, with none of the ancient traditions of so much of our common-law of real property.

Accordingly, in our resolution of the question posed by the Court as to whether the alleged common-law rule first mentioned in *Aukam,* should be retained, we are not restrained by a thousand years of the common-law—but restrained only by our own, relatively recent *possible* creation. Even then, the

seeds out of which it grew were not lien instrument foreclosure sales and resales, but cases involving sales and resales in respect to estate matters, in which there was never any question of private contracts, lien instruments of debtors and creditors, deficiency decrees, the language of lien instruments, and the like.

Nonetheless, at first glance, an argument can certainly be made that the supposed present common-law rule in Maryland (arising only out of the dicta of *Aukam v. Zantzinger,* 94 Md. 421, 428, 51 A. 93, 95 (1902)) might be that a defaulting purchaser in a foreclosure sale is entitled, generally, to any excess funds stemming from a foreclosure resale which was necessary because of the defaulting purchaser's failure to comply with the terms of the first sale. *See* Alexander Gordon, IV, *Gordon on Maryland Foreclosures,* § 28.02 at 840 (3d ed.1994).

However, another of our early cases was *Werner v. Clark,* 108 Md. 627, 71 A. 305 (1908), decided just six years after *Aukam.* The *Werner* Court discussed the case of *State v. Second Nat. Bank of Hoboken,* 84 Md. 325, 35 A. 889 (1896), which pre-dated *Aukam,* but was not mentioned in *Aukam.* *Hoboken* involved a specific local law provision in Baltimore City relating to taxing of auction sales. *Hoboken* is especially important because all of the cases relied on in *Aukam* arose out of estate sales and thus the language was intended to be applicable in estate sale situations. The sales in *Hoboken,* however, involved mortgage foreclosure sales and resales. Thus, relevant language the Court used in *Hoboken,* that postdated the estate cases relied on by the *Aukam* court, apparently refers to sales arising out of the foreclosure of lien instruments and, as indicated, was not considered by the *Aukam* court.

In *Hoboken,* there had been a defaulting purchaser at the first sale, and then a resale. Baltimore City was attempting to tax both of the sales. There, the Court first addressed the then practice in equity relating to foreclosure sales where the

original sale had been set aside due to sale irregularities (not including a default by a purchaser):

> "This is, of course, not a case similar to a sale by a Court of Equity after a former sale has been set aside by the Court. Of course, in such cases, under every principle of law, the first sale is a nullity. The theory upon which it is set aside is that the agents of the Court have not acted properly or wisely in making the attempted sale. In such cases there is only one sale."

*Id.* at 327, 35 A. 889. The Court then discussed the rule as to the general nature of resales when the first sale is not consummated by the original purchaser, which is the situation in the case at bar, and the situation, for that matter, in *Aukam:*

> "It is obvious the tax or duty is intended to be collected only when there has been a sale that is a consummated sale; *and whilst under a judicial resale the property is in fact again put under the hammer, it is put there not as a new, distinct independent procedure, but as a means and solely as a means to realize the money which the original but defaulting purchaser failed to pay.* The resale takes place under the original decree, supplemented by an order. It is made by the same trustees, in the same proceedings and with a view to pay off the same indebtedness for the payment of which the property was sold in the first instance, *and the money realized by it is always applied precisely as would have been applied the money bid at the original sale had that money been paid by the first purchaser.* The resale is simply an execution of the decree for a sale. Its very name imports that it is not such a new sale as to be a distinct proceeding."

*Hoboken,* 84 Md. at 330, 35 A. at 890 (emphasis added). The Court in *Aukam* failed even to mention *Hoboken. Hoboken* was subsequent to all of the cases mentioned in *Millers Equity Pro.* relied on by the *Aukam* court—*Billingsly* (1865), *Bundridge* (1881), *Early* (1887), *Mealey* (1874), *Scotten* (1830) and *Anderson* (1828). Accordingly, the Court in *Aukam* relied on the language in opinions arising out of estate cases

not involving lien indebtedness predating 1888, when there was an 1896 case which discussed, albeit also as dicta, the contrary procedures to be used when the judicial sales and resales resulted from defaulting purchasers under lien instruments.

Accordingly, the *Aukam* Court relied on inappropriate authority when it arrived at its dicta. Almost immediately afterwards in 1908 the correct procedure from *Hoboken* was laid out in the *Werner* case, but apparently not thereafter clearly recognized.

The case of *Mizen v. Thomas*, 156 Md. 313, 144 A. 479 (1929), also concerned the procedures when there was a defaulting purchaser and a resale, but in a somewhat different context, although it was concerned with deficiencies in respect to the original mortgage debt, which is also an issue in the case *sub judice*. The Court described the issue there as:

"The only question presented ... is whether, where a trustee, appointed to make sale of mortgaged property to satisfy the debt secured by the mortgage, reports a sale of the property to the purchaser, and permits the sale to be ratified, and subsequently, upon the failure of the purchaser to comply with the terms of sale, asks permission to resell the property at the purchaser's risk, the mortgagors remain liable for any deficiency [in the mortgage debt] which may result after applying the net proceeds of the resale to the payment of the amount due under the mortgage, plus interest and costs."

*Id.* at 317, 144 A. at 481 (alteration added). The first sale purchase price was $11,600; the resale price was $5,670.83, a shortage of more than five-thousand dollars.[21] The first sale

---

21. .For clarity of terminology this Court uses "deficiency" to indicate the difference between the mortgage foreclosure sale price and the mortgage debt and employs "shortage" to refer to any negative difference in the prices obtained at the first foreclosure sale and at the resale. The mortgagor remains liable for a deficiency, while the defaulting purchaser, on the other hand, assumes the risk upon resale that there will be a "shortage" between the price at the first sale and the price at the second sale.

price, had it been paid, would have been sufficient to pay off the mortgage indebtedness in full. The lower price bid at the second sale, however, resulted in a deficiency in respect to the mortgage debt of $5,805.87. Thus, the resale resulted in a "deficiency" which was *also* a "shortage" although the respective sums of each may have been different. The mortgagors were contending that they were entitled to be credited on the mortgage debt with the price bid at the first sale on the theory that,

> "[W]hen the trustee allowed the sale to be ratified and stand, 'said Laurel Development Company [the defaulting purchaser at the first sale] was thereby accepted not merely as the equitable owner thereafter of said property, but as the party solely entitled to any of the surplus should such resale have resulted in a surplus, and solely liable for any deficiency resulting from said resale, and that said trustee should be required to prosecute his [deficiency] claim against said Laurel Development Company [the defaulting purchaser of the first sale] for this reason.' "

*Id.* at 316, 144 A. at 480 (alterations added).

In other words, the original mortgagors were relying on the theory arising out of the pre-*Aukam* judicial sales involving estate sale situations, the very cases on which the *Aukam* Court, via *Miller's Equity Proc.*, had relied in its discussion. The mortgagee's assignee argued, however, that:

> "[N]either the ratification of the sale to an irresponsible and defaulting purchaser, nor the resale at the purchaser's risk, could affect the liability of the mortgagors for the payment of the mortgage debt, nor their liability for the payment of any deficiency resulting from the inadequacy of the mortgaged property to satisfy that debt."

*Mizen,* 156 Md. at 318, 144 A. at 481 (alteration added).

The Court then described the situation that resulted, in exactly opposite terms than the *Aukam* Court had described it twenty-six years earlier.

> "If we disregard technicalities, and look only at the actualities, the case is rather a simple one. The trustee

attempted to sell mortgaged property to a purchaser who happened to be wholly worthless and irresponsible, but the sale was never consummated because the purchaser failed to comply with its terms [the case here]. The property was then resold at the purchaser's risk, but the proceeds of the resale were not sufficient to pay the mortgage debt. *Prior to the resale the title to the property remained in the mortgagors, because it could not have been divested except by deed, and no deed was given, and after the resale a part of the mortgage debt still remained due and unsatisfied* [the exact same situation exists in the present case]."

*Mizen,* 156 Md. at 318, 144 A. at 481 (alterations added) (emphasis added). The Court goes on to note that "where in such a case as this the trustee reports a sale which in due course is finally ratified, the transaction is spoken of as a sale, and for many purposes it may be treated as a sale, and no mischief is occasioned by that use of the word," *Id.* at 322, 144 A. at 483, and cites to *Miller's Equity Proc.,* sec. 512, relied on by the *Aukam* Court. It continues, however, to explain further what really happens, in language that contradicts that in *Aukam,* and is distinguishable from the cases prior to *Aukam,* in that those prior cases involved sales arising out of estate distributions, not foreclosures.

"But strictly speaking it [the original mortgage foreclosure sale] is not a sale, for a sale of real estate is not complete or consummate until the property has been actually conveyed, or at least until the purchaser has so far complied with the terms of sale as to entitle him to a conveyance. The bid of the purchaser, its acceptance, the report of the trustee, and its final ratification by the court, are all successive steps in the formation and completion of a perfect and binding contract of sale, but do not amount in themselves to an actual sale. Nor can the property be treated as actually sold until the terms of sale have been met or waived, and the purchaser has received or is entitled to receive a conveyance thereof. *For until then the title to the property is still in the mortgagor, and the only interest acquired by the purchaser is the right to receive a conveyance of the*

*property upon complying with the terms of sale.* We are not now dealing with the rights and risks of the purchaser arising under a complete but executory contract of sale, but with the question as to whether there has been an actual executed sale. Therefore such expressions as are found in ... *Miller's Equity Proc.,* sec. 512 [The exact section relied on by the *Aukam* Court], are not strictly applicable, and the statement in *Lannay v. Wilson,* 30 Md. [at] 550, that 'a purchaser under a decree in equity becomes the substantial owner of the property from the moment of final ratification of the sale, and he is entitled to and can recover the rents and profits of the estate. He is not only entitled to the possession of the property, but it remains at his risk, notwithstanding the legal title may not be conveyed,' was necessarily limited to the facts of the case, and evidently was not intended to be of general application. For it would be singular indeed if a defaulting purchaser could oust the rightful owner from the possession of it, without either paying or securing the payment of the purchase price....

. . .

"The property was sold at the purchaser's risk, but that did not mean that it was [re-] sold as its property, for it was not. It was [re-]sold as the property of the mortgagors, for notwithstanding the ratification of the [first] sale to the purchaser, since it never complied with the terms of sale and the property was never conveyed to it, the title remained in the mortgagors. And it was sold at the purchaser's risk, not because he owned the property, but because he had failed to perform his contract to buy and pay for it."

*Mizen,* 156 Md. at 322–25, 144 A. at 483–84 (alterations added) (citations omitted).

Later, addressing the Mizens' interpretation of the language in the *Werner* case, *supra,* the Court noted that *Werner,* just six years after *Aukam,* had basically rejected the *Aukam* holding, stating in relevant part:

"Appellants contend that the case last cited [*Werner* ] is not in point, because it only decided that the mortgagors

had a right to except to the ratification of a resale when the price realized was less than that accepted at the first sale, but it decided more than that. Because, in deciding that, it had first to decide that the mortgagors had an interest in the property. And since they [the mortgagors in *Werner* who were trying to except to the ratification of the resale in that case] would not have been entitled to any excess of the amount realized at the second sale over the amount offered at the first sale (*Aukam v. Zantzinger*, 94 Md. 421, 51 A. 93), their only interest must have been their liability to pay any deficiency in the mortgage debt resulting from the resale. For if the mortgagors [in *Werner*] were not entitled to share in any surplus realized from the resale over the amount needed to pay the mortgage debt, interest, and costs, what interest could they have had in it except their liability to pay any deficiency remaining after the application of the proceeds of such resale to such debt."

*Mizen*, 156 Md. at 328, 144 A. at 485 (alterations added).

The Court then discussed another factually different case, *Continental Trust Co. v. Baltimore Refrigerating & Heating Co.*, 120 Md. 450, 87 A. 947 (1913), that had quoted from the *Mealey* case, one of the cases in *Miller's Equity Proc.*, sec. 512, which in turn was relied upon in *Aukam*, the case that first stated that a defaulting purchaser is entitled to the excess price upon resale. The Court in *Mizen* said:

"[I]t [the court in *Continental*] did quote with approval an expression in *Mealey* ... to the effect that property resold at the risk of a defaulting purchaser was sold as his property, but in *Werner v. Clark, supra*, in referring to that expression, it was said: 'But the last clause of the sentence just quoted, which we have underlined, shows conclusively that the distinguished judge who wrote that opinion [the *Mealey* opinion] did not mean to be understood as saying that the defaulting purchaser was to be regarded as the owner of the property, but that he meant that in any event the proceeds of the resale, after payment of costs and commissions properly allowable, was to be applied to the amount of the purchase money due on the former sale [the

entire mortgage debt due under the mortgage], without regard to whom such amount was due.' "

*Mizen*, 156 Md. at 328, 144 A. at 485 (alterations added).

Accordingly, the theory relied upon in *Aukam*, within twenty-six years of its holding had been distinguished if not virtually discredited and overruled in two subsequent cases.

*McCann v. McGinnis*, 257 Md. 499, 263 A.2d 536 (1970), includes *Aukam* in a string cite for the proposition, albeit as dicta, that the statute at issue there applied to mortgage foreclosure sales conducted under powers of sale. In its discussion, however, the *McCann* Court relied on what had been said in *Dalrymple v. Taneyhill*, 4 Md. Ch. 171 (1853):

" 'The Act of 1841, ch. 216, under which the proceeding for a resale was had, gives no countenance to the idea that a noncomplying purchaser is regarded as the owner of the estate sold by a trustee. It authorizes a resale of the property at his risk, but not as his property, on the contrary, *the order which the Court is authorized to pass by this Act, and the order which was in fact passed in this case is a revocation of the order confirming the sale* and destroys any inchoate title which the first purchaser may have acquired by the confirmation.' "

*McCann*, 257 Md. at 508, 263 A.2d at 540–41 (emphasis added) (quoting *Dalrymple, supra* ). The *McCann* Court, addressing the issue before it, whether a defaulting purchaser remains liable for shortages between the purchase price at the first sale and the purchase price at a resale, also noted: "Apparently the chancellor ... [was] under the impression that a rescission of the order of ratification of the sale automatically relieves the purchaser of responsibility for any loss in the event of a resale. At least since *Dalrymple v. Taneyhill, supra*, such has not been the case." *McCann*, 257 Md. at 511, 263 A.2d at 542. Similarly, we held in *Mizen*, 156 Md. at 329, 144 A. at 485, that a resale does "not affect the obligation of the mortgagors to pay the mortgage debt, and that they remained after the resale, as they were before, personally liable for the payment of any deficiency remaining after the

application of the net proceeds of any completed sale of the property under a foreclosure of the mortgage."

Both parties contend that, while this Court has not specifically discussed the *Aukam* proposition for nearly one hundred years, it has never been explicitly overruled. As we have indicated, the present Court has examined *Aukam* and views the underlying basis of its dicta as limited to situations involving judicial sales arising out of estate matters. Moreover, its holding was limited to permitting defaulting purchasers at a first sale to file exceptions to the second sale because the first sale defaulting purchaser had possible liability for the difference if a lesser price was realized at the second sale.

Nonetheless, the question raised by the petitioner in the case *sub judice* is whether such an alleged common-law principle may be waived by an express contractual term in the advertisement of sale, a term to which the defaulting purchaser freely consented. The questions added by the Court are whether the *Aukam* holding should be in the law in Maryland and whether a defaulting purchaser should be entitled to reimbursement from surplus funds for property improvement and/or repair costs prior to resale.

Our holding renders petitioner's question moot. It is incorrect to assert that Maryland's common law permits a defaulting mortgage foreclosure purchaser to obtain the excess proceeds from a resale of the mortgaged property. We hold that it does not. We now further address the Court's questions in turn.

Before we continue to analyze the case *sub judice*, it is also important to set out a brief background of other principles involved in judicial sales of foreclosed property and generally of the rights held by purchasers of foreclosed property after the sale.

## A. Judicial Sales

As indicated, the power of sale or assent to decree for sale of a defaulting mortgagor's property is now authorized state-

wide by Md.Code (1974, 2003 Repl.Vol.), § 7–105(a) of the Real Property Article, which states:

"A provision may be inserted in a mortgage or deed of trust authorizing any natural person named in the instrument, including the secured party, to sell the property or declaring the borrower's assent to the passing of a decree for the sale of the property, on default in a condition on which the mortgage or deed of trust provides that a sale may be made. A sale made pursuant to this section or to the Maryland Rules, after final ratification by the court and grant of the property to the purchaser on payment of the purchase money, has the same effect as if the sale and grant were made under decree between the proper parties in relation to the mortgage or deed of trust and in the usual course of the court, and operates to pass all the title which the borrower had in the property at the time of the recording of the mortgage or deed of trust."

This Court has long said that such a "power of sale is derived from the contract of the parties contained in the deed of trust." *Waters v. Prettyman*, 165 Md. 70, 75, 166 A. 431, 433 (1933). The judicial sale in the case *sub judice* was authorized by a "power of sale" clause within a 1993 deed of trust, and such clauses generally allow a trustee to sell the property at a public auction after default by the mortgagor.

If a mortgage or deed of trust contains a power of sale, then the procedures for the subsequent sale are governed by Title 14, Chapter 200 of the Maryland Rules. *See* Md. Rule 14–201(a) (stating, *inter alia*, that "[t]he rules in this Chapter apply to foreclosure of liens upon property that are created or authorized to be created by a lien instrument or are created by a statute providing for foreclosure in the manner specified for foreclosure of mortgages"). Md. Rule 14–202(a) discusses which parties may institute actions under power of sale or assent to decree actions. Md. Rule 14–202(b)(1) sets out the requirement that an action cannot be instituted "unless the power [of sale] is exercised or application for an order is made or consented to by the holders of not less than 25% of the entire debt due under the lien instrument," while Md. Rule

14–202(c) lists the exception to Rule 14–202(b)(1) for actions to foreclose a deed of trust. Md. Rule 14–203 concerns conditions precedent to a sale as well as the venue for the sale. Specifically, Md. Rule 14–203(a)(1) requires:

"An action to foreclose a lien may be filed after (A) the instrument creating or giving notice of the existence of the lien has been filed for record, and (B) there has been a default in a condition upon which the lien instrument provides that a sale may be made or there is a default in the payment of the debt secured by a statutory lien."

Commencement of the action is governed by Md. Rule 14–204, which does not require a hearing to be held prior to sale.

The procedures prior to a foreclosure sale, including the notice requirements, are governed by Md. Rule 14–206. Md. Rule 14–206(b)(1), which outlines the specific notice by publication requirements, states:

"After commencement of an action to foreclose a lien and before making a sale of the property subject to the lien, the person authorized to make the sale shall publish notice of the time, place, and terms of sale in a newspaper of general circulation in the county in which the action is pending. 'Newspaper of general circulation' means a newspaper satisfying the criteria set forth in Code, Article 1, Section 28. A newspaper circulating to a substantial number of subscribers in a county and customarily containing legal notices with respect to property in the county shall be regarded as a newspaper of general circulation in the county, notwithstanding that (1) its readership is not uniform throughout the county, or (2) its content is not directed at all segments of the population. For the sale of an interest in real property, the notice shall be given at least once a week for three successive weeks, the first publication to be not less than 15 days prior to sale and the last publication to be not more than one week prior to sale." [22]

---

**22.** *See also* Md.Code, Real Property, Section 7–105 "Sales," *supra.*

Md. Rule 14–206(b)(2)(A) requires that notice of the "time, place, and terms of sale" by certified and first-class mail be sent to the last known address of the debtor, the record owner of the property and "the holder of any subordinate interest in the property subject to the lien."

The actual sale of the property is governed by Md. Rule 14–207. Md. Rule 14–207(b) discusses the person authorized to make the sale of the foreclosed property for actions under a power of sale or an assent to decree. A trustee authorized to make a sale pursuant to Md. Rule 14–207(b), for either a power of sale or an assent to decree, must be a natural person. Md. Rule 14–207(c) sets forth the terms of payment under each type of sale.

Pursuant to Md. Rule 14–207(d), "[t]he procedure following a sale made pursuant to this Rule shall be as provided in Rules 14–305 and 14–306, except that an audit is mandatory." (alteration added).[23] Md. Rule 14–305(a) mandates that "the person authorized to make the sale shall file with the court a complete report of the sale and an affidavit of the fairness of the sale and the truth of the report." Md. Rule 14–305(b) mandates that the purchaser file an affidavit before the sale

---

**23.** Generally, Title 14, Chapter 200 of the Maryland Rules governs the foreclosure of lien instruments such as a foreclosure action pursuant to a power of sale or an assent to a decree provision contained within a mortgage or deed of trust. Title 14, Chapter 300, however, governs "all sales of property that are subject to ratification by a court," except as is otherwise specifically provided in Maryland Rules 2–644, 3–644 and Chapter 200 of Title 14. Therefore, Chapter 300 applies to foreclosure sales as much as is specifically provided for by Chapter 200 of the Maryland Rules. Maryland Rule 14–207(d)'s language calls for the post-sale procedures to be governed by two Chapter 300 rules (except that an audit is mandatory), specifically, Md. Rules 14–305 and 14–306, while the remaining Chapter 200 rules control pre-sale and sale procedures for foreclosure actions under both power of sale and assent to decree provisions. In this case, as court ratification of a sale and resales are post-sale procedures, we are concerned, generally, with Md. Rule 14–305, because Md. Rule 14–207(d) states that Rule 14–305 shall control these procedures. The only Chapter 200 provision governing resales is Md. Rule 14–207(e), which authorizes the court to order the resale to be conducted by the person making the previous sale or a special appointee. The record in the case *sub judice* presents no issue with regard to this rule.

can be ratified. Md. Rule 14–305(d) allows for any holder of interest in the property to file exceptions to the sale and authorizes the court to hold a hearing on those exceptions. Md. Rule 14–305(e) calls for the court to ratify the sale if "(1) the time for filing exceptions ... has expired and exceptions to the report either were not filed or were filed but overruled, and (2) the court is satisfied that the sale was fairly and properly made." Furthermore, "[u]pon ratification of a sale, the court ... may refer the matter to an auditor to state an account." Md. Rule 14–305(f) (alteration added). Finally, where a purchaser fails to comply with the terms of settlement, *i.e.*, defaults, Md. Rule 14–305(g) states that "the court, on application and after notice to the purchaser, may order a resale at the risk and expense of the purchaser or may take any other appropriate action." Where such a resale is ordered by the court, "the court may order that the property be resold by the person who made the previous sale, or by a special trustee appointed by the court." Md. Rule 14–207(e).

In *Plaza Corp. v. Alban Tractor Co., Inc.*, 219 Md. 570, 578, 151 A.2d 170, 174 (1959), in the context of a foreclosure sale resulting from a defaulted mortgage for chattels and real property, we stated:

"The sale under the decree did not pass the title to the property sold until the sale was ratified and confirmed. Before ratification the transaction was merely an offer to purchase which had not been accepted. The court was the vendor acting through its agent, the trustee, who had been appointed to make the sale. When he reported the offers of the bidders for the property to the court, no contracts of sale had been completed and no title had been transferred to the prospective purchasers. But, when the offers were accepted and the sales to the respective bidders were ratified and confirmed (*and the purchase money paid*), the contracts of sale became complete and the title to the property sold passed." [Emphasis added.]

*Cf. Hickey v. Peck*, 180 Md. 289, 297–99, 23 A.2d 711, 716–17 (1942) (explaining, generally, that in the context of a tax sale, a

sale made under a decree of a court is subject to the approval of the court).

■ The trustees, acting under a power of sale, must comply with certain duties and equitable principles in order for the sale to be ratified and the contract formed. Even then title does not pass until the contract is performed, *i.e.*, the purchase price paid. The role and duty of the trustees in these contractual sales was aptly stated by the intermediate appellate court in the present case, when that court said:

"Trustees acting under a power of sale contained in a deed of trust have discretion to outline the manner and terms of sale, provided their actions are consistent with the deed of trust and the goal of securing the best obtainable price:

'While the discretion in the manner and terms of sale, lodged in the trustee under the terms of the deed of trust, is contractual, and gives a wider latitude to the trustee than that ordinarily allowed trustees making sales under orders or decrees of the court, yet such discretion has never been held to be unlimited. When a sale thus made is attacked, it must be shown that the trustee did not abuse the discretion reposed in him, and that the sale was made under such circumstances as might be fairly calculated to bring the best obtainable price. **The trustee not only represents the holder of the note secured by the deed of trust, but also the owners of the property, who would be entitled to any surplus remaining after the payment of expenses and the note secured by the deed of trust.** The power of sale is derived from the contract of the parties contained in the deed of trust, but the report of the sale must be made to and ratified by the court [and the purchase price paid] before a deed for the property is given by the trustee to the purchaser. Upon the sale being reported to the court, it assumes jurisdiction and permits those interested in the sale or the proceeds thereof to file objections to its ratification. Upon such being filed, it is the duty of the court, in order to ratify the sale, to ascertain that it was fairly made and

under such circumstances and conditions as might be reasonably expected to have produced the largest price obtainable.'

*Waters,* 165 Md. at 75, 166 A. 431 (emphasis added); *see also Miller,* § 456 at 538 (mortgagee acting under power of sale 'acts not for himself alone, but as a fiduciary, and for the benefit of all parties interested in the proceedings')."

*White,* 152 Md.App. at 241–42, 831 A.2d at 524–25 (footnote omitted).

A trustee must comply with the duties of obtaining the best possible price for the lender without unfairly prejudicing the purchaser before the sale will be ratified by the court. Once the court ratifies the sale, equitable title passes to the purchaser. We said in *Merryman v. Bremmer,* 250 Md. 1, 241 A.2d 558 (1968) (although in the context of a judicial sale arising out of estate proceedings and not a foreclosure sale (the post-sale proceedings for both types of actions currently are governed by the same rules, Md. Rules 14–305 and 14–306)), that: [24]

"When the sale is finally ratified, the purchaser's inchoate equitable title, acquired at the time of the acceptance of his offer by the trustee, becomes complete and the purchaser's equitable title is established retroactively to the time of the original acceptance of the offer by the trustee. The purchaser is entitled to the rents and profits of the land sold as he has become the substantial owner of the property. He is not only entitled to possession of the property, but it remains at his risk, even though legal title may not be conveyed. If the land appreciates in value that benefit

---

**24.** While *Merryman* and some of the other previously cited cases did not arise out of foreclosure proceedings either pursuant to a power of sale or an assent to decree provision, they are nonetheless applicable because of Md. Rule 14–207(d). As previously mentioned, Rule 14–207(d) states that post-sale procedures of an action under Title 14, Chapter 200 of the Maryland Rules, *i.e.,* foreclosure actions arising out of either a power of sale or an assent to decree provision, are to be governed by Md. Rules 14–305 and 14–306. The post-sale procedures of other judicial sales, such as sales arising out of an estate proceeding like in *Merryman,* likewise are now governed by those rules.

accrues to the purchaser; if it depreciates in value that is the purchaser's loss. The purchaser is entitled to maintain his equitable title as the substantial owner of the land until he is divested of it as provided by law."

*Merryman,* 250 Md. at 8, 241 A.2d at 563 (citations omitted).

In *Merryman,* we held that a purchaser does not lose equitable title and keeps the right to pay the purchase price in full to obtain the deed where, after a sale was ratified, the trustee failed to petition the court to compel a resale and the purchaser delayed in completing the sale for 20 years. Unless the trustee takes action, *i.e.,* petitions the court either to set aside the sale or to compel a resale, the purchaser maintains equitable title, all risk of loss on the property and the right to complete the sale by paying the full purchase price.[25] Although we stated in *Merryman* that the increase in value between the sale and conveyance of title accrued to the purchaser, it was in the context of a non-defaulting purchaser and did not involve a resale.

## B. Resales

Although this Court has stated that a purchaser in some types of judicial sales and under some circumstances does not necessarily lose his equitable title in a property after technically defaulting on the payment of the purchase price, *see Merryman,* 250 Md. at 11–12, 241 A.2d at 565–66 (holding that a purchaser did not abandon his equitable title and right to pay fully the purchase price where the trustee did not petition the court for a resale and the purchaser was ready, willing and able to pay the purchase price, although 20 years had passed after the ratification of the sale), the trustee, under most circumstances of default, will normally petition the court to order a resale of the property pursuant to Md. Rule 14–305(g), which, as previously mentioned, states that the

---

**25.** In *Merryman,* we additionally noted that with a long delay between ratification and the completion of the sale due to the fault of the purchaser, the trustees may be entitled to the equitable relief of reimbursement of the taxes paid by them with certain interest. *Merryman,* 250 Md. at 12, 241 A.2d at 566.

resale is "at the risk and expense of the purchaser." The order of resale revokes the ratification of the first sale. *See McCann* and *Dalrymple, supra.* A resale, however, is within the continuation of the original foreclosure even though additional conditions may attach to the resale. That was pointed out in *Hoboken, supra,* where a decree was passed for the sale of a mortgaged property and the purchaser defaulted on the balance of the purchase money. As stated earlier, this Court said the following in reference to judicial resales relating to defaults of lien instruments:

> "[W]hilst, under a judicial resale the property is in fact again put under the hammer, it is put there not as a new, distinct independent procedure, but as a means and solely as a means to realize the money which the original but defaulting purchaser failed to pay. The resale takes place under the original decree, supplemented by an order. It is made by the same trustees, in the same proceedings and with a view to pay off the same indebtedness for the payment of which the property was sold in the first instance, and the money realized by it is always applied precisely as would have been applied the money bid at the original sale had that money been paid by the first purchaser. The resale is simply an execution of the decree for a sale. Its very name imports that it is not such a new sale as to be a distinct proceeding."

*State v. The Second Nat'l Bank of Hoboken,* 84 Md. at 330, 35 A. at 890 (alteration added). *See also Continental Trust Co. v. Baltimore Refrigerating & Heating Co.,* 120 Md. at 451, 456–57, 87 A. at 949–50 (in the context of a judicial sale and resale arising out of a mortgage "to secure an issue of two thousand bonds of the par value of $1,000.00 each."); *Werner, supra,* 108 Md. at 635, 71 A. at 309 (1908) (power of sale foreclosure); *Schaefer v. O'Brien,* 49 Md. 253, 256 (1878) (sale and resale of mortgaged property after default by mortgagor).

We hold that there is no common-law rule in Maryland that a defaulting purchaser is entitled to excess proceeds realized at a resale, nor should there be. Any interpretation of *Aukam* to the contrary is rejected.

## C. The Mortgage Foreclosure Process' Protection of the Mortgagor's Interest

The process of selling the whole property at foreclosure dates back to the 1785 statute and the interpretation of it by our 1835 *Boteler* case, *supra*. Our interpretation in that case recognized that the statute was designed to protect mortgagors. *Boteler* recognized that although the statute appeared to require that only that portion of mortgaged property sufficient to pay off the mortgage debt was to be sold, it was impractical to do so because there was no way to determine in advance how much property should be offered for sale because there was no way to predict what the bids for the property would be. Thus, the *Boteler* Court provided as an alternative that the whole property be sold with surplus proceeds going to the mortgagor.

That early statute recognized that the mortgagor was to retain the land not needed to satisfy the debt. It was intended to insure that the mortgagor only lost so much of the land as was necessary to pay the debt. When that process proved impractical, the Court devised another method of insuring that the mortgagor retained the value of land not needed to be sold to pay off the mortgage debt, by permitting the sale of all of the land but returning to the mortgagor any sums received above the costs of sale and the mortgage debt as representing the value of the land above the amount of the mortgage debt.

Thus, clearly, from very early days, the practice of mortgage foreclosures was designed to (1) pay the expenses of sale, (2) pay off the mortgage debt, (3) return to the mortgagor the surplus as representing the true remaining value of the property sold. (Later, of course, other holders of liens, judgments, etc. were inserted into the priorities for payment out of surplus funds.)

Were the original intents of the 1785 statute to have been accepted and were sales held as that early statute indicated, there would never have been any surpluses or deficiencies. No claims by defaulting purchasers at a first sale against

excess proceeds at a resale could have been possible. There would not be any.

Thus, as we have stated, the underlying origins of the proper priorities to be applied to sums received at any foreclosure sale, be it an initial sale or a resale, have been for over two hundred years to primarily protect the interests of mortgagors and mortgagees. Absent statutory modifications, and we know of none relating to interests of defaulting purchasers in the excess proceeds at resale (and the parties have not directed our attention to any such statute), *defaulting purchasers have no claim against excess proceeds at the resale, albeit they remain liable for "shortages."*

We have undertaken an extensive review of the development of mortgage foreclosure sales and our examination makes clear that preservation and protection of the mortgagor's and the mortgagee's interests have emerged over historical time as the paramount considerations. As the common-law governing lending practices gradually evolved from the draconian strict foreclosure to the more modern approach that provides the defaulting debtor, not only a right to redeem the property by payment of the outstanding lien instrument debt even after default, but also the ability to derive some benefit from the equity he may have accrued in his property, even in the event of a default, courts have sought outcomes that are equitable and fair both to the mortgagee *and* to the mortgagor and other creditors. That is, the mortgage foreclosure process, in its present form, seeks to assure that if any value remains in the property after the creditor (or creditors) has received full payment, it goes to the mortgage debtor.

The antithesis of fairness was the early 18th century (and before) practice of strict mortgages and strict foreclosure, which deprived a defaulting mortgagor of the entire value of the property even where he had defaulted on only a very small portion of the lien instrument, and practice of ejectment actions, in which mortgagees—who, at that time, were the title-holders of the pledged property—endeavored to clear the title of the conditions that might allow the debtor to retake the

property following a default. Enforcement by courts of these conveyances with, at times severe, conditions seemed to overlook, as stated in our earlier discussion of Venable's *The Law of Real Property*, the "fact that the real nature and intent of the transaction was that the land was to be held as a security for a debt." *Id.* at 177.

Over time, courts of equity began to ascertain that mortgagors' use of their equity of redemption was an expression of the different interests that the mortgagor and the mortgagee held in the property. In discussing the parties' interests in *Washington Fire Ins. Co. v. Kelly*, 32 Md. at 440, we stated:

"Courts of Equity, though a mortgage be forfeited, and the estate absolutely vested in the mortgagee, at common law, yet they will allow the mortgagor, at any reasonable time, to redeem his estate. So long as the estate can be shown to have been treated as a pledge, there is a recognition of the mortgagor's title."

Thus, our Court recognized that while the mortgage is intended to secure the debt, both the interests of debtor and of creditor command certain protections, even in the event of default.

In a mortgage context, the property's primary purpose is to secure the repayment of a debt. Should the mortgagor fail, once a period of time has elapsed following his default, to repay the entirety of the remaining debt so as to retain and/or recover the property, statutes enable the mortgagee to petition the court for a bill of foreclosure or to proceed to foreclose under the supervision, generally, of the court, while also protecting the mortgagor from complete divestiture of his interest. As indicated, we discussed in *Boteler and Belt v. Brookes, supra*, the 1785 statute which apparently was Maryland's first statute requiring the sale of the mortgaged premises in default situations and establishing the role of the equity courts (*i.e.* the chancellor) in ratifying the foreclosure sale and assuring proper priority of payment of the money raised by the sale through audits. *Boteler* noted the Legislature's direction that a sale should occur of only that portion of the

property sufficient to satisfy the outstanding mortgage debt, but the *Boteler* court also lamented that there was no formula to assure that a designated portion of the property would produce, with certainty, a specific sum of money. 7 G. & J. at 154. Thus, the trustee's duty to satisfy the debt at the foreclosure sale might result in a surplus of funds. Accordingly, this 1785 law, as interpreted by the *Boteler* court, provided that the sale proceeds were to be applied first to the costs of sale, then to the mortgage debt and to interest owed to the mortgagee. If a surplus remained, however, the mortgagor was entitled to receive it, his lien instrument debt having been discharged. Apparently, because the price bid at the sale reflected the true value of the property, he was entitled, after payment of the mortgage debt and costs, to receive the residual value as reflecting the remaining value of his land.

Although the foreclosure sale cuts off the mortgagor's equitable right of redemption, his legal interest in his property does not cease until the foreclosure sale is complete and a conveyance has occurred. We stated in *Union Trust, supra,* that the foreclosure sale purchaser acquires "the equitable interest in the land commensurate with that conveyed by the mortgage deed, and he was entitled to the legal title upon the final ratification of the sale by the court and the payment of the purchase money." 153 Md. at 55, 137 A. at 512. Full vesting of his interest, therefore, is subject to his obligation to pay which, in turn, is "subject to the right to enforce the payment of any of the purchase money by a resale at the risk of the buyer." *Id.* at 55–56, 137 A. at 512. Thus, when the purchaser defaults, whether due to his/her unwillingness or inability to consummate the sale, the foreclosure process is interrupted, the sale incomplete, and the defaulting purchaser's title remains inchoate. Therefore, a resale is needed to "pay off the same indebtedness for the payment of which the property was sold in the first instance, and the money realized by it is always applied precisely as would have been applied the money bid at the original sale *had that money been paid by the first purchaser.*" *Hoboken,* 84 Md. at 330, 35 A. at 890 (emphasis added). The trustees' receipt from the court of a

decree for resale divests the defaulting purchaser of "his equitable title as the substantial owner of the land." *Merryman*, 250 Md. at 8, 241 A.2d at 563. As indicated *supra*, the order of resale effectively revokes the ratification of the first sale.

This is not to say that the decree necessarily cuts off the defaulting purchaser's interest in the outcome of the resale. He may have an interest because he is responsible for shortages. He may retain the right to except to the way the resale was held, *i.e.*, advertisements, etc., but he has no right to claim excess funds. Our cases have recognized that a defaulting purchaser's interest at the resale is in addition to the undiminished interest of other parties (mortgagor, mortgagee, junior lien holders, etc.) that existed at the foreclosure sale as well as at subsequent sales. We stated in *Lannay v. Wilson*, 30 Md. 536, 550 (1869), a case involving a judicial sale by a trustee, that "the dry legal title, and the right of possession often become completely severed, at least for a time,—the legal title remaining in some of the parties to the cause, while the equitable estate and right to possession become vested in the purchaser." *See also Dalrymple v. Taneyhill, Mizen v. Thomas*, and *McCann v. McGinnis, supra*. It is the defaulting purchaser's exposure, on the other hand, that somewhat differs from that of the other parties. The trustee (or assignee) at the foreclosure sale and at the resale, acts on behalf of all parties and seeks to "enforce the payment of the purchase money; and one of the most effective ways to accomplish that is a resale of the property at the risk of the purchaser." *Aukam*, 94 Md. at 427, 51 A. at 95. We have defined the risk to the defaulting purchaser as his liability, stemming from his failure to perform his obligations arising out of the initial sale, that if there be a shortage between the price he bid at the foreclosure sale and the price that the property fetches at the resale he will be responsible to the other parties, *i.e.* the mortgagee, the mortgagor or trustees, if applicable. Since at least 1785, the Court, then, has remained cognizant of the need to protect the interests of the mortgagor, who has not been relieved of his liability for a deficiency on the mortgage

at any time during the sale and resale in the foreclosure process, as well as the interest of the mortgagee who has invoked the power of the court in pursuit of satisfaction of the debt owed to him. In some cases, however, proceeds in excess of the price at the initial sale and also in excess of that needed to satisfy the mortgage debt, other liens, costs of sale and commissions may be realized at the resale.

In *Andrews, supra,* our 1830 case involving a judicial sale arising from an estate matter, this Court, even in an estate judicial sale, left open the question of how excess proceeds from a second sale might be distributed pending notification of the decedent's creditors. We noted in our earlier discussion that the Court's reservation, in *Andrews,* precludes the conclusion that the defaulting purchaser of the estate property was automatically entitled to receive the resale's excess funds. Had that been the case, notice to the creditors would have been unnecessary. On revisiting this issue in *Mealey v. Page, supra,* another judicial sale under the context of an estate, that Court determined that, unlike a mortgage or deed of sale setting, there had been no actual conveyance of property. Nevertheless, the *Mealey* court ruled that the defaulting purchaser would have last priority in entitlement to the balance of proceeds from a resale. It was not incumbent upon the vendor in *Mealey,* a case involving distribution of estate assets, to be concerned with protecting the varying interests of the debtor, the creditor and the defaulting purchaser, as the Court in the instant case must be. Our holding in *Brundige v. Morrison, supra,* likewise an estate case, echoed our *Mealey* holding. Accordingly, some of our early encounters with the issue of a defaulting purchaser's entitlement to excess funds arose from judicial sales in estate matters and did not involve the protection of interests of mortgaging parties that are present in a lien instrument, such as a mortgage or as a deed of trust, as in the instant case.

This brings us, again, to the 1902 case, *Aukam v. Zantzinger, supra,* on which the party petitioner primarily bases his claim for entitlement to the surplus funds from the resale. This Court only held in *Aukam* that a defaulting purchaser

was entitled to file exceptions to the second sale prior to its ratification because of his potential liability for the shortage if the second sale resulted in a lower price than the initial sale. Our *Aukam* dicta included the statement on which petitioner relies in support of the supposed common-law rule that a defaulting purchaser is " 'entitled to any excess in the proceeds of sale at the resale.' " 94 Md. at 427, 51 A. at 95. In *Aukam* we cited to *Miller's Eq. Proc.* 620 (sec.526) and its within cases, which included *Mealey, Early* and *Brundige*— none of which involved a mortgage or deed of trust foreclosure sale and subsequent resale, *i.e.*, the facts of the case *sub judice*.

Notably, we decided *State v. Second Nat. Bank of Hoboken, supra,* in 1896, six years prior to *Aukam,* but at least fifteen years after the last estate case discussed in *Aukam.* Although *Hoboken's* holding, that a first sale, unconsummated by the original purchaser, is rendered a nullity by the resale, and therefore Baltimore City could not collect taxes on both sales, was available to the *Aukam* court, it apparently was not utilized. Thus, the *Aukam* court relied upon inappropriate authority. Soon thereafter in, *Werner v. Clark,* this Court borrowed *Hoboken's* articulation of the correct procedures in holding that " '[t]he resale is simply an execution of the [original] decree for a sale.' " *Werner,* 108 Md. at 635, 71 A. at 309 (alterations added) (citing *Hoboken,* 84 Md. at 330, 35 A. at 890). Again, the court's focus centered on its primary obligation to see the sale of the property through to completion and to preserve the interests of the lien instrument parties.

Not until 1929 in *Mizen v. Thomas, supra,* did we again examine the procedures of a mortgage foreclosure sale, and specifically the deficiencies in respect to the original mortgage debt. Our holding in *Mizen* reflects this Court's recognition of the lien parties' continuing paramount interests throughout the sale and resale. Accordingly, we reiterate our holding that there is no common-law rule that a defaulting purchaser from a first sale is entitled to excess proceeds realized at a resale.

## D. Defaulting Purchaser's Entitlement to Reimbursement

We now determine, where excess sums above the price bid at an initial sale result from a sale following the first default, whether the court should permit or require the reimbursement of the defaulting purchaser for the expenses he incurred in making improvements and/or repairs to the property prior to the resale.

A purchaser bears the risks of the property upon his bid, and as a result, a successful bidder may want to take steps to protect the equitable interest that he has received following the foreclosure sale. He does not take these steps, however, for the protection of the parties to the mortgage, but rather for his own protection and benefit. He insures the property, if he does, to protect his interest during the period when he retains that interest. The purchaser, however, is not entitled to the full legal benefits of the property, *i.e.*, the legal interest held by the mortgagor (or a trustee), until he satisfies the terms of sale and receives a conveyance of the property. Should he default, as did the purchaser in the instant case, he cannot claim the benefits of complete ownership because he never fully consummated that ownership. That is, he failed to fulfill his obligation to comply with the terms of sale and to pay the balance of his purchase price. This Court generally does not reward parties for failure to perform obligations, even if a party has acted in good faith. But for the purchaser's default, thus necessitating a resale, there would be no situation giving rise to a defaulting purchaser's claim for excess funds. And once a resale occurs, the defaulting purchaser's *prior* equitable interest, an interest that terminated upon the order for resale, does not entitle him either to the excess proceeds of a resale or normally to any sums he may have expended to protect or enhance his interest-while he had an interest, since the value over and above the lien instrument debt belongs to the mortgagor as the remaining value of his property.

■ Petitioner contends that Maryland Rule 14–208(a),[26] governing the proceeds of sale and, specifically, the distribution of surplus, provides for the protection of a defaulting purchaser who makes improvements or expends any funds for the benefit of the property.

We disagree. The rule does not appear to have been created to protect defaulting purchasers but to protect the interests of the lien holders and other claimants of like character.

Petitioner's argument sounds in equity and, in his view, the defaulting purchaser is afforded "claimant" status and is to be granted a priority for any improvements or expenditures made for the preservation of the property. In this sense, petitioner equates improvements with necessary repairs performed to avoid the property's (further) deterioration.

There may be a distinction between improvements to the property, generally, and repairs necessarily made to the property in order to prevent damage, vandalism or waste. Respondents observe, however, that an increase in price at a resale[27] is not necessarily attributable to improvements made to the property and such a determination would necessitate an evidentiary hearing.

■ As we have observed in *Mizen, supra,* "until the terms of [foreclosure] sale have been met or waived, and the purchaser has received or is entitled to receive a conveyance" of the property, title to the property remains in the mortgagor. 156 Md. at 323, 144 A. at 483. The equitable interest

---

26. Md. Rule 14–208(a) states: "At any time after a sale of property pursuant to Rule 14–207 [sale pursuant to foreclosure of lien instrument] and before the final ratification of the auditor's account, any person claiming an interest in the property or in the proceeds of the sale of the property may file with the court an application for the payment of that person's claim from the surplus proceeds of the sale. The court shall order distribution of the surplus equitably among the claimants."

27. Petitioner contends, and respondents dispute, that petitioner made improvements to the property that resulted in the higher price at the resale, and, thus, he is entitled to some, or all, of the excess proceeds.

that the purchaser receives is subject, of course, to his successful execution of the conditions of the sale. As stated earlier "[a]lthough he thus becomes the substantial *owner* from the time of the sale, and the property is at his gain if it appreciate and at his risk in case of loss by fire or through depreciation, yet, notwithstanding the purchase money be paid, the legal title of the purchaser does not vest until the deed to him is delivered, but, upon its delivery, this deed is not effective merely from the day of its execution, but vests the property in the purchaser from the day of sale." *Union Trust,* 153 Md. at 56, 137 A. at 512. In other words, *if* the purchaser at the first sale fully complies with the terms of sale, pays the purchase price and receives a deed to the property, his title relates back to the date of the sale. Therefore, actions—whether precautionary or otherwise—taken by the purchaser following the foreclosure sale are intended for his own benefit and protection. They protect primarily his interests, not the interests of the mortgagor.[28] His interest is dependent upon his performance of the obligations of the sale. Measures taken by a foreclosure sale purchaser including making necessary repairs and/or improvements to the property, securing insurance on the property and paying property taxes are not made for the benefit of the mortgagor. Once a resale order is executed by the court, the ratification of the original sale is either explicitly or impliedly revoked.[29] It is clear, therefore, that where the purchaser continues to make improvements, and/or to pay taxes and insurance premiums

---

**28.** *See e.g. Donald v. Chaney,* 302 Md. 465, 477 n. 11, 488 A.2d 971, 977 (1985). "The Purchasers were in possession of the premises from the day following the sale until the date of settlement and thus had 'a direct and strong interest in protecting the property from injury, and rendering it as productive as possible.' *Wagner v. Cohen,* 6 Gill 97, 103 (1847)."

**29.** We stated in *Merryman,* 250 Md. at 8, 241 A.2d at 564, that the purchaser maintains his equitable title until divested of as provided by law, usually by the trustees' petition for a resale. Therefore, the purchaser may be operating with or without his equitable interest as the "substantial owner," but his equitable title certainly terminates, at the very latest, upon the hammer's fall at the resale and probably at the time the court orders a resale.

after he has defaulted on the terms of the sale and his equitable interest may have ceased, those payments, improvements and repairs are made not only at his own risk, but also for the protection of his/her own interest in the property not the mortgagor's interest, and normally should not be recoverable from any of the proceeds of either sale.

The mortgagor, on the other hand, has remained liable for a deficiency on the mortgage debt throughout the foreclosure process, through both the sale and the resale. Denying the defaulting purchaser the excess sums from a resale serves to insulate the mortgagor, and/or lender, from incurring a greater loss where the property was sold at the original sale for a price under the remaining lien debt. At the point of the second sale, the defaulting purchaser at the first sale has failed to perform his obligations and has lost any equitable interest arising from the initial sale, a failure that at one time could have resulted in incarceration for contempt. Albeit his failure to perform may not have resulted from bad faith, he is nonetheless the wrongdoer as to the original sale. While there may be a benefit to other interested parties [30] it only can be realized if a higher price is procured at resale. It will be extremely difficult for a court ever to determine conclusively the reason or reasons that a property may be more valuable at a resale. A higher price may be due to market conditions, different buyers, or any number of reasons.

The mortgagee and mortgagors always remain at risk that the resale will procure *less* money for the purchase price than the original sale. In that event, the mortgagor would be subject to a larger deficiency owed to the mortgagee, with the only recourse being an action against the defaulting purchaser who has already shown his lack of ability to meet his obligations. The mortgagor is the one placed in larger risk when a resale is necessary. Thus not only is a mortgagor entitled to excess funds by reason of his right to the full value of his property, his claim to excess funds is at least as equitable as is

---

**30.** For example, a junior lien holder might benefit as well.

a defaulting purchaser's.[31]   In addition, while the mortgagor cannot escape the contractual terms giving rise to the foreclosure sale of his property, the bidder at a foreclosure sale voluntarily chooses to attend the sale.   The bidder is under no obligation to attend or, even where the bidder chooses to attend, to bid.

The mortgage foreclosure purchaser who fails to settle on his purchase of the foreclosed property, even if in good faith, is, technically at least, a wrongdoer.   It remains that "He who seeks equity must do equity."   Persons should not be able to reap windfalls while the mortgagor and lender are forced to be subject to a resale and an elongation of the foreclosure process and possible additional risks.

In the case *sub judice*, petitioner, in fact, defaulted on the terms of sale twice—once at the original sale and once at the resale.   Such actions illustrate his lack of ability [32] or intention to settle in his own behalf and to comply with the terms of sale.   The law should not be quick to reward his failure to consummate the purchase of the property where the trustees have sought and accomplished a resale.

Therefore, for the reasons stated, this Court holds that, absent fraud or extraordinary circumstances, circumstances not existing in this case, a court should not order reimbursement to a defaulting purchaser for the costs of improvements and/or repairs that he has made to a property prior to resale.

---

**31.**  Even when the resale brings a higher price, especially when the price still does not produce a sum sufficient to pay the mortgage debt, the mortgagor has suffered additional loss.   Interest has continued to accrue during the period between the sales.   The mortgage debt increases and the remaining value of the mortgagor's interest in his land decreases because of the failure of the defaulting purchaser.

**32.**  If one lacks the ability to settle, he should not bid.   In *Donald v. Chaney*, 302 Md. at 478, 488 A.2d at 977, we obliged the purchasers to pay interest on the unpaid balance of the purchase price where they had delayed settlement due to their inability to obtain financing within the time fixed for settlement.   We stated, "It plainly is the duty of a purchaser at a judicial sale to assure the court that he is ready, willing and *able to comply with the terms fixed for its completion." Id.* (citations omitted) (emphasis added) (footnote omitted).

With our decision on the issues we have addressed, the matter of attorneys' fees, even if preserved, is moot. We also do not address the issue of whether the common-law relating to mortgages can be modified by the terms of an advertisement of sale or other contract.

## V. Conclusion

We hold that the common-law right alleged to exist and gleaned from *Aukam's* dicta, that a defaulting purchaser is entitled to the excess proceeds arising from the property's resale, is not, in fact, the common-law of this State. Even if *Aukam's* dicta had in some fashion risen to common-law status we would overrule it based upon the history of the creation of mortgage foreclosure sales. A defaulting purchaser remains at risk for the difference if the price at the resale is less than the winning bid at the original sale. Because the defaulting purchaser is effectively a wrongdoer insofar as he is unable to, or chooses not to, satisfy the terms of the foreclosure sale, he will not, absent fraud or extraordinary circumstances, be entitled to reimbursement of costs for improvements, or even for repairs or other maintenance expenses or charges on the property prior to the resale.

Accordingly, we affirm the judgment of the Court of Special Appeals, albeit for the reasons we express herein.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**